762 F.2d 243
 53 USLW 2601, 1985-1 Trade Cases 66,634,
1 Fed.R.Serv.3d 849
 EASTWAY CONSTRUCTION CORP., George Jaffee, Irving H. Kanarek
and Robert Jacobs, Plaintiffs-Appellants-Cross-Appellees,
v.
The CITY OF NEW YORK, Nathan Leventhal, individually and as
Deputy Mayor of the City of New York, Anthony G. Gliedman,
individually and as Commissioner of the New York City
Department of Housing Preservation and Development, Charles
Reiss, individually and as Deputy Commissioner of the New
York City Office of Development, Defendants-Appellees-Cross-Appellants,
and
The Community Preservation Corporation, Michael Lappin,
individually and as President of the Community
Preservation Corporation, Defendants-Appellees.
 Nos. 735, 1015, Docket 84-7752, 84-7786.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 28, 1985.
Decided May 21, 1985.
 
 James L. LaRossa, New York City (LaRossa, Cooper, Axenfeld, Mitchell & Bergman, New York City, Burton S. Cooper, Thomas S. Finegan, Edward M. Chikofsky, New York City, of counsel), for plaintiffs-appellants-cross-appellees.
 Fred Kolikoff, New York City (Frederick A.O. Schwarz, Jr., Corp. Counsel of the City of N.Y., New York City, Larry A. Sonnenshein, New York City, of counsel), for defendants-appellees-cross-appellants.
 David B. Tulchin, New York City (Sullivan & Cromwell, New York City, Deborah C. Moritz, New York City, of counsel), for defendants-appellees.
 Before KAUFMAN, OAKES and MESKILL, Circuit Judges.
 IRVING R. KAUFMAN, Circuit Judge:
 
 
 1
 We are confronted today with an appeal by a general contracting firm which, frustrated by a series of setbacks, sought vindication and relief in the federal courts. Denied access to redevelopment projects sponsored or approved by the City of New York, it first sought to negotiate an amicable agreement with City officials. When the negotiations broke down, the contractor filed a petition in the courts of New York State challenging the City's refusal to do business with it. It did not prevail.
 
 
 2
 Somewhat desperately, perhaps, the contractor brought the instant action in the United States District Court for the Eastern District of New York, charging the City and others with violations of the antitrust and civil rights laws. The defendants below moved successfully for summary judgment, and unsuccessfully for attorneys' fees as a sanction for having brought a frivolous action. We are thus called upon to address the propriety of the district court's dismissal of the claims, as well as its denial of the motion for attorneys' fees. We pause to set forth the relevant facts before turning to the ultimate legal discussion.
 
 I. BACKGROUND
 
 3
 a. Eastway's Dealings With the City
 
 
 4
 Eastway Construction Corporation ("Eastway") is a general contractor that, for many years, was engaged in the construction of publicly financed housing rehabilitation projects in New York City. The individual plaintiffs below are officers of the corporation.
 
 
 5
 Between 1966 and 1974, the City of New York ("City"), through its now defunct Municipal Loan Program, loaned a total of nearly twelve million dollars to limited partnerships controlled by various principals of Eastway.[1] The low-interest loans were given to enable the partnerships to rehabilitate thirty-four multiple dwellings in depressed neighborhoods. Eastway served as general contractor on most of the projects.
 
 
 6
 The majority of the loans were non-recourse, and were secured by mortgages on the buildings. Eastway was the general contractor on most of the projects. By 1981, the loans were in arrears in the total amount of nearly eight million dollars. And by March 1983, all but three of the buildings that had secured the loans had reverted to City ownership through mortgage foreclosure or in rem taking. The three remaining buildings had mortgage arrears totaling approximately three million dollars.
 
 
 7
 During the early 1970s, the Municipal Loan Program was rocked by a well-publicized scandal. One City official was convicted of extortion and accepting bribes, and several developers were charged with fraud. Eastway's President, George Jaffee, admitted making payments to the official in charge of the Municipal Loan Program during this period in an attempt to expedite pending loan applications.
 
 
 8
 In the aftermath of the scandal, New York State revamped its Private Housing Finance Law ("PHFL"), and created the New York City Housing Development Corporation ("HDC"), see N.Y.Priv.Hous.Fin.Law Secs. 650-670 (McKinney 1976). Pursuant to the statutory scheme in operation at that time, the City was given supervisory authority over certain redevelopment projects. Specifically, it was empowered to regulate the creation and operation of redevelopment companies formed under Article V of the PHFL, see id. Secs. 100-126. Moreover, the City was authorized to control the identities of the firms with which Article V redevelopment companies contracted, see id. Sec. 112(3).
 
 
 9
 Still reeling from the Municipal Loan Program scandal, the City decided it would no longer enter into rehabilitation contracts with firms whose principals controlled companies that had defaulted on or were in arrears with respect to loans received from the City. In 1980, the policy was extended to forbid companies under City supervision from entering into contracts with firms that had defaulted or that were in arrears. Because Eastway's principals controlled entities that had defaulted on City loans, Eastway was precluded from contracting with companies that were engaged in City-financed reconstruction projects. In effect, Eastway was put out of business.
 
 
 10
 In response, Eastway mounted a two-prong attack against the implementation of the City's policy. First, it initiated an Article 78 proceeding in the New York State Supreme Court, seeking to have the policy declared arbitrary and capricious.[2] Simultaneously, it sought to negotiate a "work out" agreement with the City, pursuant to which it would restructure and reschedule its affiliated companies' debt, in exchange for a promise by the City to approve its involvement in future redevelopment projects.
 
 
 11
 The legal challenge proved to be unsuccessful. After Eastway prevailed in the Supreme Court, the Appellate Division reversed and dismissed its petition, holding that the City's policy was a proper exercise of its discretion. See Eastway Constr. Corp. v. Gliedman, 86 A.D.2d 575, 446 N.Y.S.2d 306 (1st Dept.1982). No appeal was perfected to the Court of Appeals,[3] see Eastway Constr. Corp. v. Gliedman, 58 N.Y.2d 972 (1983).
 
 
 12
 Negotiations on the "work out" agreement proved equally fruitless for Eastway. At one point, the firm and the City did indeed arrive at a tentative agreement, pursuant to which Eastway would pay the City a portion of monies expected to be received on new projects, and the City would not prevent Eastway from participating in City-supervised ventures. The tentative agreement was never executed by HPD, however, and never went into effect.
 
 
 13
 b. Eastway's Dealings With CPC
 
 
 14
 The Community Preservation Corporation ("CPC") is a private consortium of thirty-nine commercial and savings banks that conduct business in New York City. Founded in 1974 for the purpose of facilitating the redevelopment of multiple-family dwellings in depressed neighborhoods, CPC extends low-interest loans to private developers engaged in housing rehabilitation projects. Since its inception, CPC financing has resulted in the creation or rehabilitation of more than 11,000 apartments.
 
 
 15
 In June 1978, Michael Lappin, then a neighborhood loan officer with CPC, received an application from Everett Jennings, on behalf of Orange Realty Co., for a loan of $575,000 to be used in the rehabilitation of a building located at 850 St. Marks Avenue in Brooklyn. The application did not name Eastway as general contractor. After consulting with CPC's President, Lappin rejected the application due to the developer's limited financial resources, as well as questions regarding the bona fides of the property's financial history. Specifically, CPC's internal investigation revealed a questionable relationship between the building's seller-mortgagor and buyer-mortgagee. In fact, George Jaffee's brother-in-law was a principal of each, and this identity of interests raised the spectre that the sale of 850 St. Marks Avenue may not have been an arm's-length transaction.
 
 
 16
 In July 1981, Jennings once more applied to CPC for financing of the rehabilitation of the St. Marks Avenue property. Again, neither Eastway nor any of its principals was listed as a proposed contractor and, again, CPC rejected the application.
 
 
 17
 Finally, in 1983, Orange Realty--this time listing Eastway as general contractor--applied to Chemical Bank, N.A., and obtained a commitment for one-half of the financing required to rehabilitate the building. The commitment was conditioned upon the agreement of HDC to lend the balance. As it had with other applications by developers naming Eastway as contractor, the City declined to approve the loan. Neither CPC nor Lappin had any involvement with the 1983 application.c. The District Court Proceedings
 
 
 18
 By early 1984, Eastway's demise as a general contractor in the public redevelopment field was nearly complete. The City had declared openly that it would approve no loans to developers using Eastway. That decision had been judicially upheld in connection with the Harlem Gateway NSA II project. And the City had reaffirmed its resolve by rejecting the loan to Orange Realty. Accordingly, on February 3, 1984, Eastway commenced the instant action in the District Court for the Eastern District of New York. Its thirty-six page complaint listed eleven separate causes of action, two of which arose under federal law. Named as defendants were the City of New York, a Deputy Mayor, the Commissioner and a Deputy Commissioner of the New York City Commission on Housing Preservation and Development ("HPD"), CPC, Michael Lappin, Chemical Bank and fifty unidentified "John Does."
 
 
 19
 In framing its first cause of action, purportedly sounding under Section 1 of the Sherman Act, 15 U.S.C. Sec. 1 (1982), Eastway alleged that the "defendants (except the defendant Chemical Bank, N.A.) ... combined, conspired and confederated for the purpose of injuring the plaintiffs' trade, commerce and business ... by, inter alia, preventing the plaintiffs from gaining the approval necessary to carry on their business in the relevant market." The second cause of action was a broad-ranging civil rights claim, alleging "conduct in violations of Eastway's rights under Article I, Section 10, Article IV, Section 2, and the First, Fifth, Ninth, Tenth and Fourteenth Amendments to the United States Constitution." The nine remaining causes of action alleged violations of state law. In its prayer for relief, Eastway sought an injunction against the City and Chemical Bank, and money damages totaling nearly one billion dollars.
 
 
 20
 In April 1984, CPC and Lappin moved to dismiss the complaint for failure to state a claim, pursuant to Fed.R.Civ.P. 12(b)(6) or, alternatively, for summary judgment, pursuant to Fed.R.Civ.P. 56. They also sought to impose sanctions--including costs and attorneys' fees--against the plaintiffs and their counsel, pursuant to Fed.R.Civ.P. 11. In a supporting affidavit, Lappin stated that, prior to the commencement of the lawsuit, he had never even heard of Eastway; that his sole contact with Jaffee had been in 1974 or 1975 when, as an employee of HPD, he had rejected a loan application submitted by Jaffee; that he had learned from a City Commissioner of Investigation that Jaffee had been involved in irregularities involving the Municipal Loan Program during the 1970s; and that the City and CPC had never agreed to refrain from dealing with Eastway or its principals.
 
 
 21
 During argument on the motion before Chief Judge Weinstein, the court indicated that it did not believe the plaintiffs had made out violations of the antitrust or civil rights law, and was inclined to dismiss. Judge Weinstein further denied Eastway's request for discovery. Not wishing to dispose of the case on a piecemeal basis, however, the court reserved judgment on the motion pending resolution of the case against the municipal defendants.
 
 
 22
 In June, the City and its officers moved for summary judgment, and also sought attorneys' fees. In their affidavits, the City officials candidly admitted that the City had in fact decided to refrain from doing business with Eastway as a result of its principals' involvement in the Municipal Loan Program. They denied, however, the allegation that they had encouraged others not to deal with the plaintiffs.
 
 
 23
 In August 1984, Chief Judge Weinstein held another hearing, at which he considered both the municipal and private defendants' motions for summary judgment. After oral argument, the court granted both motions, finding that there was not "any basis for a civil rights claim," and that "the affidavits and other supporting data [do not] show any violation of the antitrust laws." The judge opined that "the most that has been shown ... is a possible commercial tort which can be adjudicated in the state courts...." Finally, in response to a request from counsel for the City, the court stated: "No, you are not going to get attorneys' fees in this case. I can't say that this was a frivolous case." Judgment dismissing the action was entered, and Eastway timely filed a notice of appeal. The municipal defendants in turn filed a cross-appeal from that part of the judgment denying their motion for attorneys' fees.
 
 II. DISCUSSION
 
 24
 a. Eastway's Appeal
 
 
 25
 We need not tarry over Eastway's appeal from the decision of the district court granting summary judgment against it and dismissing its complaint.
 
 
 26
 We have long recognized that summary judgment is a "drastic device, since its prophylactic function, when exercised, cuts off a party's right to present his case to the jury." Heyman v. Commerce & Industry Ins. Co., 524 F.2d 1317, 1320 (2d Cir.1975). Accordingly, the moving party bears a heavy burden of demonstrating the absence of any material issues of fact, Patrick v. LeFevre, 745 F.2d 153, 158 (2d Cir.1984); see Adickes v. H.S. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Moreover, in reviewing a Rule 56 motion, a district court must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion, id.; see United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). If, in this generous light, a material issue is found to exist, summary judgment is improper, and the case must proceed to trial, see Schering Corp. v. Home Ins. Co., 712 F.2d 4, 9 (2d Cir.1983); United States v. One Tintoretto Painting Entitled "The Holy Family with Saint Catherine and Honored Donor", 691 F.2d 603, 606 (2d Cir.1982).
 
 
 27
 Turning to the other side of the Rule 56 equation, we have recently stressed the importance of the materiality element in deciding motions for summary judgment, see Quarles v. General Motors Corp., 758 F.2d 839 (2d Cir.1985). "[T]he mere existence of factual issues--where those issues are not material to the claims before the court--will not suffice to defeat a motion for summary judgment." Id. at 840. Moreover, in opposing a motion, a party may not rest upon mere conclusory allegations or denials, see Shering, supra, at 9; Fed.R.Civ.P. 56(e). Rather, it is incumbent upon a defending party to set forth "supporting arguments or facts in opposition to the motion." SEC v. Research Automation Corp., 585 F.2d 31, 31 (2d Cir.1978).
 
 1. The Civil Rights Claim
 
 28
 In light of the standards we have enunciated, it is manifest that Eastway's self-styled "civil rights" claim was properly dismissed. Eastway simply claims that the City has refused to allow it to participate in City-sponsored or City-supervised redevelopment projects. The City readily admits to this fact, and points as justification for its policy to the involvement by Eastway's principals in certain malefactions stemming from the Municipal Loan Program of the 1970s. The sole question, then, becomes one of law--namely, whether the City's refusal amounts to a violation of Eastway's civil rights.
 
 
 29
 Eastway's claim purports to sound under 42 U.S.C. Sec. 1983 (1982), which provides a remedy to those who, as a result of state action, suffer a deprivation of "rights, privileges or immunities secured by the Constitution and laws of the United States." It is axiomatic that a successful Sec. 1983 claim requires more than a showing that one has been wronged at the hands of a state or municipal official. Rather, a plaintiff must allege that he has been deprived of some right secured by federal statute or the United States Constitution. See Baker v. McCollan, 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979).
 
 
 30
 Yet, nowhere does Eastway allege a deprivation of any federally secured right. If the reference in the complaint to the fourteenth amendment is meant to suggest that the City's actions amount to a deprivation of property without due process, such a claim cannot succeed, for Eastway's involvement in publicly-financed projects does not rise to the level of a property interest. The Supreme Court has stated: "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Certainly, Eastway desired--and perhaps even needed or expected--to continue acting as a general contractor on public redevelopment projects. But it fails to point to a single constitutional, statutory or contractual provision that would entitle it to do so. And absent any such right, its claim that the City's actions violate Sec. 1983 is incorrect as a matter of law.
 
 
 31
 Although it did not argue this point in the district court, Eastway now argues that it was deprived of the "right to have the City rule upon its application for project approval and financing in both a timely and impartial manner." Even if we were to hold that such a property right exists--and we do not do so--it cannot be said that Eastway was deprived of its property without due process of law. The Article 78 proceeding in New York's state courts constituted due process sufficient to protect Eastway's claimed property interest in a fair and impartial review of its application.[4] See Parratt v. Taylor, 451 U.S. 527, 543-44, 101 S.Ct. 1908, 1917, 68 L.Ed.2d 420 (1981).
 
 
 32
 Accordingly, the district court's dismissal of the civil rights claim was proper and, indeed, mandated. Although Judge Weinstein relied on the affidavits submitted in support of the Rule 56 motion, and thus granted summary judgment, we believe it would have been equally proper to dismiss the civil rights count for failure to state a claim, pursuant to Rule 12(b)(6).
 
 2. The Antitrust Claim
 
 33
 Although Eastway's antitrust count is superficially more complex than the civil rights claim, it does not raise a colorable federal issue, and was also properly dismissed below.
 
 
 34
 We note at the outset that, although Eastway seeks to argue that the City and CPC engaged in concerted action aimed at excluding it from the publicly-financed redevelopment market, it also alleges no facts from which the inference may be drawn that the appellees in fact did so. Neither CPC nor Lappin are even mentioned in that part of the complaint that seeks to allege an antitrust violation. Any purported connection between CPC and Eastway appears exceedingly tenuous at best. Indeed, it is undisputed that CPC never received a loan application on which any plaintiff was listed as contractor. CPC and Lappin may simply have been added as defendants because Eastway, knowing that the City could not be deemed to conspire with itself for the purposes of Section 1 of the Sherman Act, needed to find some other "conspirator."
 
 
 35
 We need not dwell, however, on the paucity of factual support for the Section 1 count. For, even assuming that such support could be found in the record, Eastway's complaint wholly fails to make out a viable claim under the antitrust laws.
 
 
 36
 The Supreme Court has clearly established that a plaintiff has standing to assert an antitrust claim only where the injury alleged is of the type that the antitrust laws are designed to prevent. Associated General Contractors of California, Inc. v. California State Council, Inc., 459 U.S. 519, 538-40, 103 S.Ct. 897, 909-10, 74 L.Ed.2d 723 (1983); Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). It is not enough that a plaintiff alleges that it is "in a worse position than [it] would have been had [defendants] not committed [the acts complained of]." Brunswick, supra, at 486, 97 S.Ct. at 969. Such a minimal requirement would "divorce[ ] antitrust recovery from the purposes of the antitrust laws," "which 'were enacted for the protection of competition, not competitors.' " Id. at 487-88, 97 S.Ct. at 696-97 (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)).
 
 
 37
 Mindful of these standards, it is clear that Eastway has altogether failed to allege a valid antitrust claim. Even if Eastway was excluded from the relevant market, and even if its exclusion was the result of a "contract, combination or conspiracy" between the City and CPC, such action could not possibly have injured competition. Indeed, Eastway does not even allege anti-competitive effect.[5] In plain fact, neither the City nor CPC in their roles as mortgage lenders stood to gain from the inhibition of competition among general contractors.
 
 
 38
 If Eastway's antitrust complaint were deemed to state a claim, every joint decision to hire one contractor over another--whether based on reputation, price, past performance, etc.--would be assailable under the Sherman Act. Although in each such case the rejected contractor would undoubtedly be unhappy, such a result would pervert the intent of those who drafted the antitrust laws.
 
 
 39
 There were simply no genuine issues of material fact to be resolved before the district court. Accordingly, Judge Weinstein was correct in dismissing--indeed, he had no alternative but to dismiss--Eastway's antitrust claim. As was true of the Sec. 1983 claim, it might just as easily have been dismissed pursuant to Rule 12(b)(6).
 
 3. Denial of Eastway's Discovery Request
 
 40
 In light of our foregoing conclusions, it should come as no surprise that we affirm Judge Weinstein's decision to deny Eastway's request for discovery. We have held that, "[w]here a plaintiff fails to produce any specific facts whatsoever to support a conspiracy allegation, a district court may, in its discretion, refuse to permit discovery and grant summary judgment." Contemporary Mission, Inc. v. United States Postal Service, 648 F.2d 97, 107 (2d Cir.1981). A bare assertion that evidence to support a fanciful allegation lies within the exclusive control of the defendants, and can be obtained only through discovery, is not sufficient to defeat a motion for summary judgment. Id.; see Donnelly v. Guion, 467 F.2d 290, 293 (2d Cir.1972); United States v. Donlon, 355 F.Supp. 220, 225 (D.Del.), aff'd, 487 F.2d 1395 (3d Cir.1973).
 
 
 41
 Such was the case here. As in Contemporary Mission, supra, 648 F.2d at 107, "defendants produced affidavits setting forth reasonable grounds for their actions and, in addition, attested that they had acted in good faith. The plaintiff responded by presenting immaterial factual inconsistencies and by reiterating its conclusory allegations of conspiracy." In such a setting, the district court acted well within its discretion in granting summary judgment without affording Eastway the opportunity to vex the various defendants yet further.
 
 
 42
 Accordingly, the grant of both the municipal and private defendants' motions for summary judgment, and the denial of Eastway's request for discovery are affirmed.
 
 
 43
 b. The City's Cross-Appeal
 
 
 44
 Both groups of defendants sought attorneys' fees in the district court. Although the action was dismissed from the bench, Judge Weinstein denied the requests for fees, stating: "I can't say this was a frivolous case." The municipal defendants now cross-appeal from that portion of the judgment denying fees, arguing that the denial was an abuse of the district court's discretion.
 
 
 45
 Under the traditional "American Rule" governing allocation of the costs of litigation, the parties pay for their respective counsel's fees, regardless of the outcome of the action. See Alyeska Pipeline Serv. Co. v. Wilderness Society, 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975). In recent years, however, Congress has enacted a number of statutory exceptions to the general rule, which allow fees to be shifted to the prevailing party. Certain of these statutes mandate that fees be awarded, see e.g., 15 U.S.C. Sec. 15 (Clayton Act); 29 U.S.C. Sec. 216(b) (Fair Labor Standards Act of 1938, as amended ); 7 U.S.C. Sec. 210(f) (Packers and Stockyards Act). Others make awards discretionary, but limit them to prevailing plaintiffs, see e.g., 5 U.S.C. Sec. 552a(g)(2)(B) (Privacy Act of 1974); 42 U.S.C. Sec. 3612(c) (Fair Housing Act of 1968). The majority of these provisions are more flexible, allowing fees to be awarded to either plaintiff or defendant, and entrusting courts with the effectuation of the underlying policy.
 
 
 46
 Notable among the fee shifting provisions is The Civil Rights Attorney's Fees Act of 1976, codified at 42 U.S.C. Sec. 1988 (1982). Section 1988 provides that, "[i]n any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985 and 1986 of this title, ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." In construing a similarly worded fee statute, see 42 U.S.C. Sec. 2000a-3(b) (1976), the Supreme Court has held that a district court may award attorney's fees to a prevailing defendant only where it finds "that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978). In a slightly modified rearticulation of that standard, the Court held that "a plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." Id. at 422, 98 S.Ct. at 701. The same standard was applied to 42 U.S.C. Sec. 1988 two years later in Hughes v. Rowe, 449 U.S. 5, 15, 101 S.Ct. 173, 178, 66 L.Ed.2d 163 (1980), and has been followed in this Circuit since. See Harbulak v. County of Suffolk, 654 F.2d 194 (2d Cir.1981); see also Prate v. Freedman, 583 F.2d 42 (2d Cir.1978) (reversing a denial of fees to defendants in Title VII action).
 
 
 47
 We have already expounded upon our views regarding Eastway's Sec. 1983 claim, and are impelled to the conclusion that it was "unreasonable and groundless, if not frivolous," Harbulak, supra, 654 F.2d at 198, within the meaning of the standard set forth by the Supreme Court. Eastway could not point to a deprivation of any single right conferred by federal law or the United States Constitution, yet it "continued to litigate through to summary judgment," id.
 
 
 48
 In addressing the issue of attorneys' fees, we find it particularly noteworthy that Eastway had already challenged the City's policy in the state courts, and had been unsuccessful. These proceedings should at least have put it on notice of the possibility that its adversary might be awarded counsel fees. See Carrion v. Yeshiva University, 535 F.2d 722, 728 (2d Cir.1976) (upholding award of attorney's fees to successful defendant in Title VII action, where plaintiff had brought similar claims in state proceeding and had lost).
 
 
 49
 Accordingly, in light of all the circumstances surrounding this troublesome litigation, we hold that Judge Weinstein erred in denying the municipal defendants' motion for attorneys' fees incurred in defending against Eastway's cause of action alleging a violation of its civil rights.
 
 
 50
 Apart from the statutory provisions allowing for the shifting of litigation costs, a federal court may award attorneys' fees pursuant to its inherent equitable powers, or pursuant to the dictates of Fed.R.Civ.P. 11. When acting within its equitable powers, costs may be awarded to a prevailing party only where the unsuccessful litigant has been found to have " 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.' " Alyeska Pipeline, supra, 421 U.S. at 258-59, 95 S.Ct. at 1622 (quoting F.D. Rich Co. v. United States ex rel. Industrial Lumber Co., 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974). In Browning Debenture Holders' Comm. v. DASA Corp., 560 F.2d 1078 (2d Cir.1977), this Circuit held that there must be "clear evidence" that the claims are "entirely without color and made for reasons or harassment or delay or for other improper purposes." Id. at 1088; see Nemeroff v. Abelson, 620 F.2d 339, 348 (2d Cir.1980).
 
 
 51
 Rule 11, however, provides a somewhat more expansive standard for the imposition of attorneys' fees, see Abraham v. United States, 582 F.Supp. 257 (S.D.N.Y.1984). In pertinent part, Fed.R.Civ.P. 11 states:
 
 
 52
 The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.
 
 
 53
 The language of the rule, which was amended in 1983, provides a striking contrast to the words of its predecessor.[6] Prior to the 1983 amendment, the rule spoke in plainly subjective terms: An attorney's certification of a pleading was an assertion that "to the best of his knowledge, information, and belief, there [was] good ground to support it." The rule, therefore, contemplated sanctions only where there was a showing of bad faith, Nemeroff, supra, 620 F.2d at 348, and the only proper inquiry was the subjective belief of the attorney at the time the pleading was signed.
 
 
 54
 The addition of the words "formed after a reasonable inquiry" demand that we revise our inquiry. See Schwarzer, Sanctions Under the New Federal Rule 11--A Closer Look, 104 F.R.D. 181 (1985). No longer is it enough for an attorney to claim that he acted in good faith, or that he personally was unaware of the groundless nature of an argument or claim. For the language of the new Rule 11 explicitly and unambiguously imposes an affirmative duty on each attorney to conduct a reasonable inquiry into the viability of a pleading before it is signed. Simply put, subjective good faith no longer provides the safe harbor it once did.
 
 
 55
 The notes of the Advisory Committee on Rules appear to support this expanded reading of the rule. The Committee was frank in admitting that, "in practice Rule 11 has not been effective in deterring abuses." See also 5 Wright & Miller, Federal Practice and Procedure: Civil Sec. 1334 (1971). Thus, the drafters speak of the amended rule as an attempt to "build[ ] upon and expand[ ]" the equitable doctrine. To this end, they state, the new language is "intended to reduce the reluctance of courts to impose sanctions ... by emphasizing the responsibilities of the attorney" (emphasis added). Finally, the drafters make absolutely clear that the standard is more stringent than the original good faith formula set forth in Nemeroff, supra.
 
 
 56
 In light of the express intent of the drafters of the new Rule 11, and the clear policy concerns underlying its amendment, we hold that a showing of subjective bad faith is no longer required to trigger the sanctions imposed by the rule. Rather, sanctions shall be imposed[7] against an attorney and/or his client when it appears that a pleading has been interposed for any improper purpose, or where, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law.
 
 
 57
 In framing this standard, we do not intend to stifle the enthusiasm or chill the creativity that is the very lifeblood of the law. Vital changes have been wrought by those members of the bar who have dared to challenge the received wisdom, and a rule that penalized such innovation and industry would run counter to our notions of the common law itself. Courts must strive to avoid the wisdom of hindsight in determining whether a pleading was valid when signed, and any and all doubts must be resolved in favor of the signer. But where it is patently clear that a claim has absolutely no chance of success under the existing precedents, and where no reasonable argument can be advanced to extend, modify or reverse the law as it stands, Rule 11 has been violated. Such a construction serves to punish only those who would manipulate the federal court system for ends inimicable to those for which it was created. See Schwarzer, supra, at 182.
 
 
 58
 Returning to the facts of this appeal, we cannot say for a certainty that Eastway or its counsel acted in subjective bad faith in bringing or maintaining this lawsuit, or that its actual motive was to harass the City. After its travails of the preceding decade, it might just as well have been acting out of frustration or desperation. We can say, however, that its claim of an antitrust violation by non-competitors, without any allegation of an antitrust injury, was destined to fail. Moreover, a competent attorney, after reasonable inquiry, would have had to reach the same conclusion.
 
 
 59
 Accordingly, we hold that it was error for the district court to deny the municipal defendants' motion for attorneys' fees incurred in defending against the antitrust claim. On remand, the district court shall impose appropriate sanctions against the appellants-cross-appellees, their counsel or both, which shall include an order to pay the municipal defendants the amount of the reasonable expenses incurred by them in defending the antitrust claim, including a reasonable attorney's fee.
 
 III. CONCLUSION
 
 60
 The judgment of the district court dismissing Eastway's claims in their entirety is affirmed. That portion of the judgment denying the municipal defendants' motion for attorneys' fees is reversed. The cause is remanded to the district court for further proceedings in conformity with this opinion. Costs to appellees.
 
 
 
 [1]
 George Jaffee, one of the plaintiffs below, was a particularly active participant in the Municipal Loan Program. By 1971, he was a principal in corporations and partnerships that had received fourteen loans totaling nearly five million dollars. By 1971, seven firms in which Jaffee was a principal were in arrears in a total amount of $43,949.32
 
 
 [2]
 The state proceeding centered around the City's refusal to approve Eastway as a contractor on a project known as Harlem Gateway NSA II. Eastway's petition claimed that the City's policy was illegal because the company had proved itself to be a competent contractor; because defaults by related firms had no bearing on its competence; and because it had been denied a hearing
 
 
 [3]
 Eastway claims that an appeal was not taken because it was then attempting to negotiate a "work out" agreement with the City, and was hopeful that it would succeed. It is interesting to note, however, that bargaining was already underway when Eastway filed its petition in the Supreme Court
 
 
 [4]
 In light of our holding that Eastway failed to make out a viable claim pursuant to Sec. 1983, we need not address the appellees' argument that Eastway is collaterally estopped to relitigate that claim because it was the basis of the prior Article 78 proceeding
 
 
 [5]
 The case before us is instantly distinguishable from those (cited by Eastway) where no allegation of anti-competitive effect is necessary. See, e.g., Silver v. The New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); Radiant Burners, Inc. v. Peoples Gas Light & Coke Co., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); Klor's Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). In those and other per se unlawful group boycott cases, the excluded plaintiff was in competition with some or all of the defendants. The same certainly cannot be said here; neither the City nor CPC competes in any way with any defendant
 
 
 [6]
 Before the 1983 amendment, Rule 11 provided in pertinent part:
 The signature of an attorney [on a pleading] constitutes a certificate by him that he has read the pleading; that to the best of his knowledge, information and belief there is good ground to support it; and that it is not interposed for delay.
 
 
 [7]
 By employing the imperative "shall," we believe the drafters intended to stress the mandatory nature of the imposition of sanctions pursuant to the rule. Unlike the statutory provisions that vest the district court with "discretion" to award fees, Rule 11 is clearly phrased as a directive. Accordingly, where strictures of the rule have been transgressed, it is incumbent upon the district court to fashion proper sanctions
 A natural concomitant of a mandatory imposition of sanctions is a broadened scope of review by the Court of Appeals. Where the only question on appeal becomes whether, in fact, a pleading was groundless, we are in as good a position to determine the answer and, thus, we need not defer to the lower court's opinion.
 At the same time, however, we note that the district courts retain broad discretion in fashioning sanctions, and apportioning fees between attorney and client. The commentary to Rule 11 sets forth a number of the factors that will be examined in arriving at an appropriate award, and in determining by whom any costs will be borne. In reviewing the specifics of an award of attorneys' fees, therefore, we shall continue to adhere to the "abuse of discretion" standard.