**Anna RICHTER, by her next best friend Christina REEDMAN, Plaintiff,**

v.

**Alice RUSSO & Eugene Gross & John J. Lamendola, Defendants.**

**No. 85 Civ. 5074 (GLG).**

United States District Court, S.D. New York.

Oct. 1, 1986.

Thomas J. Kavanagh, New York City, for plaintiff.

Underweiser & Underweiser by Jay H. Landau, of counsel, New York City, for defendant Alice Russo.

Oscar Goldberg by Julius Mendalis, of counsel, New York City, for defendant Eugene Gross.

Bergadano, Zichello & Babchik, by Jack Babchik, Ann Teresa McIntyre, of counsel, New York City, for defendant John J. Lamendola.

GOETTEL, District Judge:

The defendants move to dismiss this action for lack of federal jurisdiction. Upon the facts, as set forth below, we conclude that the defendants' motions must be granted.

Anna Richter, a woman in her 80's, was a resident of the Yorkville area of Manhattan for fifty years. She was generally regarded as a neighborhood eccentric who spent a lot of time walking her two dogs. She owned the building in which she lived at 315 East 85th Street, as well as an adjacent building, 317 East 85th Street. Christina Reedman alleges that she rented an apartment at 317 East 85th Street in 1964, and claims to have known Anna Richter since that time. In 1972, Richter sold 317 East 85th Street; Reedman still lived there. In December 1980, Reedman was seeking a new apartment and spoke to Richter about moving into 315 East 85th Street. According to Reedman, Richter allowed her and her three children to move into the fourth floor apartment if Reedman agreed to repair the boiler.[1] In January 1981, Richter accused Reedman of stealing boiler parts and evicted her. Reedman and her three children then moved in with attorney Thomas J. Kavanagh, who lived a few blocks away. Reedman married Kavanagh a few months later.

Reedman contends that, despite being evicted and accused of theft by Richter, she continued to help the elderly woman. On September 25, 1981, Reedman brought Mrs. Richter to Metropolitan Hospital because of the latter's poor physical and mental condition. After doctors treated Richter for vermin bites and cleaned her up, she was referred for a psychiatric evaluation. The psychiatrist determined that Richter was somewhat senile and needed a structured, supervised setting because she was unable to care for herself. Reedman, with Kavanagh as her attorney, initiated a proceeding to have conservators appointed for Richter.

On December 8, 1981, a competency hearing took place before Justice Blangiardo, of the Supreme Court, New York County. Justice Blangiardo appointed Alice Russo and Eugene Gross as co-conservators of the property of Anna Richter pursuant to Article 77 of the New York State Mental Hygiene Law. Alice Russo is Mrs. Richter's niece. Eugene Gross owned a dry cleaning store on East 85th Street, and had apparently become friendly with Mrs. Richter over the years. Richter had been living in his home in Queens since October 22, 1981, when she was released from Metropolitan Hospital. Reedman and Kavanagh opposed these appointments.[2]

Kavanagh believed that he should get the legal work resulting from the conservatorship. His application was rejected and plaintiff now charges the Appellate Division, First Department with widespread corruption, fraud, and "cronyism." The plaintiff alleges that highly placed, influential members of the First Department are involved in Richter's affairs. These charges are based upon the fact that Robert P. McGreevy, Chief Law Assistant to the Justices of the Appellate Division, First Department, met Mrs. Richter through a friend of his wife who was concerned with Richter's plight. He referred Mrs. Richter to defendant John J. Lamendola, former law secretary to Justice Sandler of the First Department, for representation at the

---

1. The building at 315 East 85th Street was rat infested and the boiler was malfunctioning. All tenants had previously moved out because of its poor condition.

2. With respect to Christina Reedman, Mrs. Richter said that she knew her, but didn't want to know her.

1981 competency hearings. Reedman and Kavanagh believe they were superceded and then ousted by Lamendola in those proceedings. Since then, they have participated in an emotional and dramatic campaign to have her conservators removed for failure to comply with the orders issued at that time.

Reedman, by her attorney Kavanagh, commenced this action on July 2, 1985, claiming that she could not get a fair trial in State Court. Christina Reedman was the named plaintiff; conservators Russo and Gross, and attorney Lamendola were the named defendants. The complaint sought removal of the conservators, appointment of a new conservator, and a judgment against Lamendola for $30,000 in fees for legal services which, according to the complaint, "LAMANDOLA N-E-V-E-R R-E-N-D-E-R-E-D." Complaint ¶ 1.[3] The basis for federal jurisdiction was not clearly stated. However, it appeared that plaintiff relied upon diversity jurisdiction under 28 U.S.C. § 1332. Since all of the parties were New York citizens, diversity jurisdiction clearly did not exist.

Plaintiff immediately moved for the appointment of a temporary receiver and a guardian *ad litem*. We denied that motion and expressed doubt that federal jurisdiction could be maintained merely because plaintiff contended that the state courts were operating on a patronage basis.[4]

The defendants then moved to dismiss for lack of federal jurisdiction. Before that motion could be considered, the plaintiff amended her complaint. In the amended complaint, the plaintiff was designated as "Anna Richter, by her next best friend, Christina Reedman." Plaintiff claimed that although Richter had lived in the United States for more than sixty years, she had originally been born in Austria and had never been naturalized. Accordingly, plaintiff asserted diversity jurisdiction based upon Richter's foreign citizenship. The defendants again moved to dismiss the complaint.[5]

**3.** The first paragraph of the amended complaint makes the same allegation but corrects the spelling of this defendant's name. Defendant Lamendola says that the legal fees were never paid.

**4.** The plaintiff argues that "[n]o State Court in the corrupt First Department is going to impugn the judgment and integrity of the judiciary members of the Appellate Division which 'blessed' the unbidden intrusion of 'Bob' and 'John' into Anna Richter's life...." Plaintiff's Reply Affirmation Supporting Motion for Immediate Jury Trial at ¶ 5.C.

**5.** The defendants also argue that even if this Court does not dismiss the action for lack of jurisdiction, it should abstain in the interests of comity, since the matters involved are peculiar to an ongoing conservatorship proceeding in which the State of New York has an especially strong interest and competence. To this, the plaintiff replied,

If the NY State Courts have an especially strong interest and "well developed competence" in the matter of "lawyers' fees in Conservatorship proceedings" how come Lamendola of Underweisser put in for $44,000.00 and got $32,000.00 (on an embezzler's affidavit); and how come Goldberg, Gross' private lawyer who represents Gross' interests in disputes over the spoils of Richter's estate with Russo is encouraged and allowed by the NY State Court to ready his affidavit for a separate "Second-helping" fee—could it be less than Lamendola's $40,000.00?; how come another one of Gross' private lawyers (he has retained three so far) a realty 'expert' named Schneider collected $4,500.00 for putting a "for sale" ad in the NY Times. This $76,500.00 does not include the $40,000.00 to Gross for "maintaining" Anna Richter in captivity, nor the conversion by Gross of $10,000.00 of Anna Richter's funds to improve his private property. Added to the foregoing is the additional $40,000.00 in commissions for Gross and Russo. If dishing out $165,000.00 by ex parte orders ia [sic] an example of the "well developed competence" of the NY State Courts in handling the financial side of Conservatorship it should not be hard for the U.S. District Judge reading these lines to understand why Anna Richter cries out to this Court, as her only hope of deliverance not only from the 52 months of one-room bondage, but also from the vulturine talons of the Co-Conservators, imposed on her by "Bob" and "John", viz Gross and Russo and their twin sets of parisitical lawyers who are outrageously permitted to deplete this helpless woman's estate assets while giving her only the sorrow and mental anguish of confinement in return.

Affirmation of Thomas J. Kavanagh, filed as "Plaintiff's Reply Affirmation Supporting Motion for Immediate Jury Trial" at 3–4.

The question of whether, for purposes of determining diversity, we should consider the citizenship of the incompetent or that of her next best friend is not clear-cut. *See generally,* 13B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3606 at 427–30 (2d ed. 1984). However, the manufacturing of federal jurisdiction by the use of guardians and next best friends as named plaintiffs is clearly frowned upon. *Id.* at 429. Here, we have the reverse, *i.e.,* the representative asks us to consider not her citizenship but that of the incompetent in order to maintain federal jurisdiction. Since evidence strongly suggested that Mrs. Richter had been naturalized (she had voted in New York elections), the Court directed the parties to explore the factual issue, which would moot the legal question.

Over a prolonged period of time,[6] the defendants obtained a number of documents clearly establishing the naturalized citizenship of Anna Richter. The plaintiff objected to this documentary evidence because of purported inconsistencies concerning the identity of the naturalized person and her various married names. Plaintiff insisted upon, and was granted, the opportunity to depose Anna Richter.

■ The deposition was conducted on June 26, 1986. Plaintiff's counsel began by advising Mrs. Richter that if she answered questions properly she might be allowed to return to her old home and her dogs. The deposition was not fruitful. Richter was obviously senile or otherwise mentally incompetent. She stoutly maintained that she was a naturalized citizen, but denied that she had ever been married to a man named Kamlach. Her citizenship petition was in the name Anna Kamlach. A copy of her marriage certificate to her last husband, Gunter Richter, lists Alex Kamlach as her prior husband, from whom she was divorced in 1944. This deposition testimony, together with the citizenship papers, marriage certificates, and voter registration, establish beyond peradventure that Anna Richter is a naturalized American citizen and a citizen of New York. Consequently, there is clearly no federal diversity jurisdiction.

■ We will consider briefly whether there are any other bases for federal jurisdiction. Reedman has alleged that Richter was "imprisoned" in Gross's home, but the report of a caseworker from the Department of Social Services contradicts that allegation. Russo and Gross have been charged with both nonfeasance and malfeasance, and criminal neglect in their care of Mrs. Richter. In addition, as mentioned above, plaintiff seeks to recover a money judgment of $30,000 against Lamendola, for legal fees for services they allege he never performed. Plaintiff Reedman charges that Mrs. Richter was not well cared for at the Gross home, and was held there against her will, as evidenced by her three-day escape in May 1984 (which attempt, Reedman says, was concealed from the courts). In addition, Reedman claims the defendants made a fraudulent attempt to "undersell" Anna Richter's property at 315 East 85th Street by obtaining an appraisal that listed its value at $325,000. By order of the New York State Supreme Court, the building was sold at a public auction and brought $675,000. *See* Amended Complaint, Exhibit G.

Plaintiff Reedman also contends that the conservators are in violation of Justice Blangiardo's order that placed Richter in temporary, not permanent, custody of Gross. That order stated, in pertinent part,

> The co-conservators will temporarily maintain the conservatee at the home of conservator EUGENE GROSS, ... and

---

**6.** While these motions to dismiss were under consideration, the plaintiff filed a "MOTION FOR AN IMMEDIATE JURY TRIAL AND DELIVERY OF PERSON OF ANNA RICHTER TO CUSTODY OF GUARDIAN AD LITEM HAROLD BAER." Plaintiff sought an immediate jury trial to commence on March 14, 1986. That motion was denied. On March 27, 1986, the plaintiff filed an interlocutory appeal from our earlier order denying an immediate jury trial, thus further delaying these proceedings. The appeal was dismissed on April 10, 1986, for appellant's failure to comply with procedural rules of the Second Circuit.

the co-conservators shall do all that is possible and practical to rehabilitate and maintain the property owned by the conservatee, ... so that such property might become income producing and otherwise suitable for the conservatee to reside therein under appropriate supervision....

Court Order Appointing Co-Conservators at 4, annexed as Exhibit C to Affirmation of Jay H. Landau in Support of Defendant Russo's Motion to Dismiss. The conservators failed to return Mrs. Richter to a rehabilitated apartment in her building or another apartment in Yorkville. Rather, she remained at the home of Eugene Gross, where a caseworker from Protective Services for Adults, Department of Social Services visited her on April 18, 1985. The caseworker found Mrs. Richter to be comfortable at the Gross home. A combination sitting room-dining room area had been converted into a bedroom for her use, and she had a television. The social worker felt that Mrs. Richter was disoriented and would not recognize her own home even if returned to it, since it would have been rehabilitated. Also, she would be forced to live with a companion who would be a stranger to her. Although Mrs. Richter expressed a desire to return to Yorkville and to be reunited with her dogs, the social worker recommended that she remain in familiar surroundings with the Gross family. It was further recommended that she participate in a daytime geriatric group, and retain a twenty-four hour-a-day home attendant.

Reedman's principal charge against the conservators rests on their failure to return Mrs. Richter to her Yorkville neighborhood and reunite her with her dogs.[7] In addition, Reedman and Kavanagh charge the defendants with converting Richter's funds for their own use, *i.e.*, $10,000 was spent on permanent improvements to conservator Gross's home where Mrs. Richter lived, and exorbitant legal fees were charged. Assets were allegedly wasted while Russo and Gross litigated, each trying to obtain sole control of Richter's realty. In addition, Kavanagh charges defendant Lamendola with numerous attempts to disbar him and to remove him from another conservatorship in an effort to discredit him.[8]

Underlying all of these wild charges is a claim of political corruption and incompetence throughout the New York state court system. Considering the current prosecutions of city officials, one cannot debate the presence of some corruption; however, the claim of such widespread corruption does not seem supported. Even if accepted as true, the federal courts are of limited jurisdiction and are not intended to compensate for shortcomings in the state judicial system. In the absence of statutory or constitutional grounds for federal jurisdiction, an action cannot be maintained in this court. Consequently, the case must be dismissed. A few final matters must nevertheless be addressed.

On July 29, 1986, shortly after her deposition, Anna Richter died. Before her death was known to plaintiff's counsel, he had made his second motion "for an immediate jury trial," despite the fact that the defendants' motions to dismiss were still outstanding. When he learned of Mrs. Richter's death, plaintiff's counsel moved to have this case placed "in suspension." (We assume he means placed on the suspense docket.) He argues that administra-

---

7. Plaintiff argues that this may be an independent basis for federal jurisdiction in that Richter's choice of an apartment, food, entertainment, etc. are a civil right. We find this claim a bit far-fetched, but need not address it because the amended complaint never set it forth as a jurisdictional basis.

8. This information is set forth in a rather unclear fashion in attorney Kavanagh's affirmation of March 24, 1986. Also implicated is Rob-

ert P. McGreevy, Chief Law Assistant to the Justices of the Appellate Division, First Department, who apparently referred Mrs. Richter to Lamendola. *See supra* p. 566. Apparently, the defendants and their counsel have sought disciplinary action against Kavanagh because of his excessive charges against them. Indeed, in this action, because of the charges made, they have requested disciplinary action. To put it mildly, counsel's behavior has been less than decorous.

tors may be appointed for Richter's estate who may have diversity of citizenship with the defendants and could bring suit in connection with the legal fee claim. However, the Court cannot keep this case on the federal calendar on the questionable contingency that a future event may confer federal jurisdiction. Moreover, the conservatorship in the state court will now have to be wound up and final fees calculated. Any claims arising therefrom are not ripe for consideration. Consequently, we are dismissing the case as brought by the present plaintiff.

All that remains to be considered is the defendants' application for Rule 11 sanctions because of the filing of this purportedly frivolous action with an obvious absence of federal jurisdiction. The plaintiff's response to the application for sanctions and attorney's fees is to state as follows:

> What mocking effrontery Mendalis displays, who is guilty of encouraging his client Gross to convert Richter's assets to his own use, when he asks that this gouging coward Gross who was willing to let Richter die before getting her full Police protection while she was missing for three days, now demands that this Court reward Gross's criminal neglect

and conversion of assets to his own use with an award of punitive costs and attorneys fees.

Affirmation of Thomas J. Kavanagh, filed as "Plaintiff's Answer to Defendant Eugene Gross's Motion to Dismiss" at 3.

> It is the height of mocking effrontery that the attorneys for the defendant Lamendola who has been exposed by documented facts to be an embezzler and perjurer capable of a Mafia style "undersell" to ask this Court to reward his criminal acts by imposing punitive costs and attorney fees on Christina Reedman....

Affirmation of Thomas J. Kavanagh, filed as "Plaintiff Richter's Answer to Defendant Lamendola's Motion to Dismiss" at 4.

■ In addition to the claimed frivolous nature of the action, the defendants emphasize the defamatory and libelous nature of the charges made by attorney Kavanagh against everyone even remotely involved with this proceeding. Beyond any question, Kavanagh's papers are replete with scurrilous attacks on everyone from the justices of the Appellate Division, First Department on down, as well as rambling, unnecessary diatribes.[9] However, since we

---

**9.** An example, chosen somewhat at random, is contained in paragraphs 10(d), (e), and (f) of Kavanagh's Affirmation of March 24, 1986, which read as follows:

> d) Bearing on the presence or absence of corruption in the First Department and also on the presence or absence of due process there affirmant can report to this Court that the referral of the removal motion to Judge Blyn brought gratifying results for McGreevy, Lamendola, and Coven as Judge Blyn fined Kavanagh $15,000.00 for opposing McGreevy's Lamendola's and Coven's application to remove him as Rohrbach's Conservator. Judge Blyn, who prudently administered the "punishment" not only without a jury trial, which affirmant sought, but without even a hearing in open Court such as was afforded to Zaccaro (before the Judge who appointed him) even though Zaccaro had converted $175,000.00 to his own use, stated in his "punitive order" that no trial was needed "under the circumstances." Shades of the "redneck" Judges of pre-civil rights days who could tell "a bad nigger" at a glance; and who would candidly tell you that "when yo' got a no-ac-

count nigger in yo' C'ot" (and Kavanagh and his wife are thus equated by Judge Blyn in the First Department) "yo' don't hardly need no tra'l, or any fuss'in with stuff like due process or equal protection. All yo' gotta do is to learn them to know their place."

> e) The truth even when viewed "in chains" as it is in this case has an awesome power and the sequel to J. Blyn's order of 10/29/85 fining Kavanagh $15,000.00—which Coven wanted to be paid by Rohrbach!!!—is that Harry Grossman, appointed as Kavanagh's substitute Conservator was so offended by the putrescent stench of corruption surrounding the removal proceeding ordered by McGreevy and Lamendola of a Conservator, Kavanagh, who had taken neither fee nor commission and had preserved the estate intact and was guilty only of being married to Christina Reedman declined the honor of being appointed Rohrbach's conservator on the recommendation of Lamendola the embezzler.

> f) The Order of appointment, rejected by Grossman, was redrawn and sent up to the "impartial" "BOB" McGreevy at the Appellate Division who sent it out for a new appoint-

have not reached the merits of the action, it would appear inappropriate to sanction plaintiff and her counsel on that basis. The strongest argument in favor of sanctions rests on plaintiff's unreasonable and prolonged opposition to dismissing the case for lack of jurisdiction. Clearly, there is not, and never has been, a basis for federal jurisdiction, at least as pleaded in the complaint and amended complaint. In this Court's view that is more than adequate justification for assessing Rule 11 sanctions. However, a divided panel of the Second Circuit in *Kamen v. American Telephone & Telegraph Co.*, 791 F.2d 1006 (2d Cir.1986), has disagreed with my view and has indicated that, in an action dismissed for lack of federal jurisdiction, it is improper for the Court to make such determinations. To do so would deter the "creativity that is the very lifeblood of the law." *Id.* at 1014 (quoting *Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 254 (2d Cir.1985)). Indeed, about the only time the Second Circuit approved of awarding Rule 11 sanctions, the trial judge had declined to grant them and, indeed, vigorously opposed their award. *See Eastway Construction, supra.* Here, the plaintiff's counsel has clearly stretched to assert federal jurisdiction. But, what may appear frivolous to this Court can apparently be viewed as "creative" to the Court of Appeals. Until the Second Circuit has clarified the line between creativity and frivolity, the District Courts in this Circuit must hesitate before imposing Rule 11 sanctions. Consequently, the application for sanctions is denied.

SO ORDERED.

ment to Justice Tyler who, by "coincidence", was the very same Judge who absolved McGreevy and Lamendola of any blame for taking Anna Richter out of Metropolitan Hospital and delivering her to Gross in open contempt of Judge Ascione's Order directing she remain there until there was a plenary hear-

ing and her Guardian made his recommendation as to who should be appointed to have custody of Anna Richter.
Affirmation of Thomas J. Kavanagh, filed as "Plaintiff's Reply Affirmation to Defendant Gross' Answer by J. Mendalis" at 7–9.