Eldon L. BERGESON, Plaintiff,

v.

Edward O. DILWORTH and Nathan O. Dilworth, Defendants.

Civ. A. No. 87–1579–T.

United States District Court,
D. Kansas.

Aug. 23, 1990.

See also 738 F.Supp. 1361.

Bradley Post of Post, Syrios & Kinch and Donald E. Shultz of Shultz & Associates, for plaintiff.

Darrell L. Warta of Foulston & Siefkin, for defendants.

## MEMORANDUM AND ORDER

JOHN B. WOOLEY, United States Magistrate.

Before the court this 23rd day of August, 1990 is plaintiff's Motion for Sanctions Under Rule 11 (Dkt. # 50, filed October 20, 1989). Defendants' Response to Plaintiff's Motion is Dkt. # 52, filed No-

vember 6, 1989. Plaintiff's Reply to defendants' response is Dkt. # 53, filed November 8, 1990. Oral arguments were heard by the court on January 5, 1990.

At the outset, it should be noted that both Sheryl Bergeson (decedent and daughter of plaintiff) and the Dilworths were all insured by the same carrier, State Farm Mutual Insurance Company (State Farm). In order to fully understand the implications of the instant motion, it is necessary to briefly review the facts.

On September 4, 1986, Sheryl L. Bergeson was fatally injured in a collision on highway U.S. 77, and died at the scene or shortly thereafter. U.S. 77 is a two lane, north-south, asphalt road. Bergeson was traveling north in a 1986 Plymouth Colt, in Marion County, Kansas. Nathan Dilworth was proceeding south driving a 1978 Ford F–250 truck towing a home-made trailer loaded with a backhoe. Nathan's father, Edward, preceded him in another vehicle which was not involved in the collision with Bergeson. It was after dark.

Eight days following the collision, Pete Miller, Claim Superintendent for State Farm, wrote to Dr. Gary L. Thompson, C.E., a well known and respected local collision reconstruction expert, requesting that he inspect the vehicles involved, the scene of the collision, and submit a written report about how the accident might have occurred. (Exhibit 2, Plaintiff's Memorandum in Support of Plaintiff's Motion, Dkt. # 50, filed October 20, 1990)

On January 8, 1987 Dr. Thompson submitted his report directly to defense counsel Warta enclosing a bill in the amount of $2,048.75 and 42 photographs. Dr. Thompson stated in that report:

"The 1978 Ford F–250 Supercab pick-up was towing a 25–foot trailer loaded with backhoe. The pick-up put down approximately 157 feet of skid marks which started in the pick-up's proper southbound lane of traffic. Approximately 17 feet south of the initiation of the pick-up's skid marks, there was a side scuff left by the edge of the highway arcing to the left for approximately 60 feet and ending approximately 1.5 feet to the

right of the centerline. The pick-up's left skid mark went left of the centerline approximately 45 feet after initiation; this skid mark stayed left of center for approximately 90 feet and the maximum distance it was left of center was 3 feet. The POI between the trailer and the 1986 Plymouth 4–door Colt was 8 feet from the centerline in the northbound lane of traffic.

... [t]he trailer became detached from the pick-up approximately where the trailer's right side-scuffing tire mark ended, i.e., about 24 feet north of the POI. The detached trailer proceeded south and to the east where it impacted the Plymouth Colt. There was approximately 12 inches of overlap of the trailer and the Plymouth at the POI. The trailer was definitely detached from the pick-up at the POI." (Exhibit 2, Plaintiff's Memorandum in Support of Plaintiff's Motion, Dkt. # 50, filed October 20, 1989).

On February 9, 1987, Mark Earnest, Claim Representative with State Farm Insurance wrote to Dr. Thompson requesting that he inspect the ball trailer hitch from the Dilworth vehicle. On March 16, 1987 Dr. Thompson wrote directly to Warta with his findings pertaining to the ball hitch and included another statement in the amount of $376.80. (Exhibit 2, Plaintiff's Memorandum in Support of Plaintiff's Motion, Dkt. # 50, filed October 20, 1989).

Suit was filed September 30, 1987 by Sheryl Bergeson's survivors (Dkt. # 1). On the same date plaintiff filed Notice of Service of Discovery (Dkt. # 4) and submitted to defendants a Request for Production containing four Requests and a set of four Interrogatories. Warta entered his appearance on behalf of the defendants, Edward O. and Nathan O. Dilworth on November 6, 1987 (Dkt. # 5). On November 20, 1987, Warta filed, on behalf of the Dilworths, an Answer (Dkt. # 6) denying that either of the Dilworths were at fault, alleging Sheryl Bergeson was at fault and that the collision was caused by her negligence in crossing the highway center line into Dilworth's southbound lane.

Addressing first the Request for Production and the Interrogatories, the third request is for:

> Any and all insurance investigation reports .describing the collision and its cause prepared by any insurance adjuster or accident investigator representing defendants or their insurers.

(See Exhibit 1, Plaintiff's Memorandum in Support of Motion for Sanctions).

Defendants' responses to plaintiff's Request for Production were signed by Darrell Warta. As to Request No. 3, above, the response was "A copy of the newspaper notice of the accident is attached." There is no mention made of Dr. Thompson's two reports, which at this point in time, were in Warta's possession, and had been, since on or about March 19, 1987. (See Dkt. # 9, filed December 17, 1987 and attachments thereto).

Interrogatory number 2 propounded by plaintiff to defendants is as follows:

> "State the name and present address of the insurance adjusters or investigators who investigated this case on behalf of defendants and/or State Farm Mutual Insurance Company.
> a. Set forth the dates upon which any investigations were conducted."

(Exhibit 1, Plaintiff's Memorandum In Support of Plaintiff's Motion for Sanctions). Warta responded to interrogatory number 2 by listing the names of Mark Earnest and Scott Miller (adjusters and/or employees of State Farm) and their addresses. No mention was made of Dr. Thompson in response to any of plaintiff's four Interrogatories. Below the answer to Interrogatory Number 1 is a note stating "The answers to these interrogatories are being furnished by defendants counsel."

The plaintiff pressed on with the preparation of the case, unaware of Dr. Thompson's investigation and reports. The defendants adamantly denied any liability or fault. Discovery was thought to be complete and the final Pretrial Order was filed on November 21, 1988. As a result of the court's Order (Dkt. # 38, filed August 22, 1989) sustaining plaintiff's uncontested Motion to Reopen Discovery, plaintiff finally discovered the existence of Dr. Thompson's investigation and reports, and the same were produced to plaintiff's counsel on or about October 14, 1989.

In plaintiff's Motion and Memorandum for Sanctions Under Rule 11, plaintiff is requesting appropriate sanctions be imposed against State Farm and/or Darrell Warta, based upon Warta signing "the pleadings, the response to request for production, and answers to interrogatories in a manner and form which deceived and caused unnecessary delay and expense in this litigation." (Page 3, Dkt. # 50, filed October 20, 1989).

During oral argument, the request for imposition of sanctions against the firm of Foulston & Siefkin was withdrawn in light of the recent United States Supreme Court decision, *Pavelic & LeFlore v. Marvel Entertainment Group, et al.,* — U.S. —, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989), which held that Rule 11 can be applied only to the individual signing the pleading, and not the law firm with which he is associated.

■ Since State Farm is not a party hereto, that portion of plaintiff's motion seeking sanctions against that company must be denied. As counsel know, neither State Farm nor any of its officers or regular employees signed the Answer or other pleadings on behalf of defendants in this case. In addition, interrogatories and requests for production, defendants' responses to which form part of the basis for the instant motion, were directed to the named defendants, and not the insurance carrier, thus there appears no basis for imposing sanctions against the insurance company, in this case.

In his Response to Plaintiff's Motion (Dkt. # 52, filed November 6, 1989), defendant argues that "There is no basis for Rule 11 sanctions to be imposed in this matter. Defendant's counsel's refusal to identify his consultant and furnish his letter reports was based on Rule 26(b)(4) and its interpretation by the Tenth Circuit in *Ager v. Jane C. Stormont Hospital & Training School for Nurses,* 622 F.2d 496 (10th Cir.1980)."

The *Ager* court interpreted Rule 26(b)(4) to separate experts into four categories, as follows:

(1) Experts a party expects to use at trial. The opponent may learn by interrogatories the names of these trial witnesses and the substance of their testimony but further discovery concerning them can be had only on motion and court order.

(2) Experts retained or specially employed in anticipation of litigation or preparation for trial but not expected to be used at trial. Except as provided in rule 35 for an examining physician, the facts and opinions of experts in this category can be discovered only on a showing of exceptional circumstances.

(3) Experts informally consulted in preparation for trial but not retained. No discovery may be had of the names or views of experts in this category.

(4) Experts whose information was not acquired in preparation for trial. This class, which includes both regular employees of a party not specially employed on the case and also experts who were actors or viewers of the occurrences that gave rise to suit, is not included within Rule 26(b)(4) at all and facts and opinions they have are freely discoverable as with any ordinary witness.

The *Ager* opinion states that it is concerned only with the second and third categories which are thereafter discussed in the opinion.

Category 3, above, is discussed first on pages 501–02. Dr. Thompson does not come within category 3 since he was retained and was formally requested, in writing, by the insurance carrier, to conduct an investigation of the collision.

Thompson does not fall within category 4 since he is not a regular employee of a party and was not an actor or viewer of the occurrences that gave rise to the suit. The issue then is whether Thompson falls within category 1 or category 2. Defendants contend that Thompson is within the purview of category 2, i.e. that he is an expert "retained or specially employed in anticipation of litigation or preparation for trial but

not expected to be used at trial." This assertion is substantiated by the language on page 3 of defendants' "Response to Plaintiff's Motion for Sanctions Under Rule 11" (Dkt. # 52), as follows:

At the time of the discovery request, it was believed by counsel that pursuant to Rule 26(b)(4)(B) Dr. Thompson was a consultant who had been contacted in anticipation of litigation without any expectation that he would necessarily testify as a witness at trial and therefore his identity and any reports compiled by him were not required to be turned over to the plaintiff or his counsel.

Further, during oral argument on January 5, 1990, defense counsel stated:

I want to talk about Gary Thompson because I did make a mistake in that regard when I first responded to a request for production and I answered interrogatories. When Mr. Post filed the lawsuit, he filed a real short set of interrogatories and a short set of request for production of documents. And in those, he asked me to identify adjusters and investigators on behalf of State Farm. I did not identify Dr. Thompson and I'll tell you the reason I didn't. In my file at that time, I had down—I took that not to mean an accident reconstruction expert, —I knew at that time that Dr. Thompson had furnished me accident reconstruction reports and I was taking the position with respect to those reports that he was an expert, he had been retained for litigation but I was deciding not to use him, and from that standpoint he was an expert consultant that I did not have to identify. There's a Tenth Circuit decision that—

Mr. Post: Objection, etc.

Thus, it is plain that defense counsel's position at the time plaintiff's initial Interrogatories and Requests for Production were received (during October or early November, 1987) was that he was not required by the law or rules to disclose to plaintiff's attorney the name of Thompson or produce his two written reports, because he was a

category 2 consulting expert not expected to be called to testify at trial.

On pages 501–502, the *Ager* court stated:

In our view, the status of each expert must be determined on an *ad hoc* basis. Several factors should be considered: (1) the manner in which the consultation was initiated; (2) the nature, type and extent of information or material provided to, or determined by, the expert in connection with his review; (3) the duration and intensity of the consultative relationship; and, (4) the terms of the consultation, if any (*e.g.* payment, confidentiality of test data or opinions, etc.). Of course, additional factors bearing on this determination may be examined if relevant.

That language is instructive and helpful in determining which of the four categories an expert "fits". Other language of the *Ager* court on page 502 is also enlightening:

The determination of the status of the expert rests, in the first instance, with the party resisting discovery. Should the expert be considered informally consulted, that categorization should be provided in response. The propounding party should then be provided the opportunity of requesting a determination of the expert's status based on an *in camera* review by the court.

■ As applied to the instant situation, the court understands this to mean that defense counsel, in the first instance, was at liberty to categorize Thompson as he then thought proper. Having once decided to place Thompson in category 2 (consultant not expected to be called to testify at trial), or in any other category, defense counsel should then have responded to plaintiff's Interrogatory and the Requests for Production by identifying Thompson as a category 2 expert and affording plaintiff's counsel an opportunity to request the court to determine Thompson's status based on an *in camera* review.

■ Since this procedure was not followed, the court must consider the factors first above explained on an *ad hoc* basis to try to determine, *as of the time* defense counsel should have followed the procedure

last suggested above, the category within which Thompson would fall.

The initial consultation with expert Thompson was made, not by counsel, but by the insurance carrier. That fact indicates that the question of which of the four *Ager* categories Thompson would fit was probably not even then considered. At least there is no evidence or indication in oral argument or the written briefs of counsel that the insurance company considered that question when or after Thompson was employed. It is well known that usually in such situations, the expert is hired to investigate, provide a written report and be available to testify later, in the event suit is filed, either by deposition before trial, or during trial, or both. It appears clear, as is argued by plaintiff's counsel (see page 1 and 2 in plaintiff's "Reply to Defendants' Response to Plaintiff's Motion for Sanction Under Rule 11" (Dkt. # 53)) that neither Warta nor any other practicing attorney had anything to do with the initiation of the original investigation made by State Farm through Gary Thompson. There being no argument or evidence presented, the court must conclude Thompson was initially hired by the insurance company under the usual conditions and circumstances as part of the company's routine procedure in the investigation of matters involving persons insured by it and was not necessarily hired by the carrier in anticipation of litigation.

The nature, type and extent of information determined by Thompson is entirely consistent with the above conclusion. Judging by the scope and detail of his written reports, Thompson made a full and complete investigation of the physical and mechanical aspects of the collision, established facts, reached conclusions based on those facts and ultimately formed an opinion that the Dilworth towed trailer was eight (8) feet over the centerline into Bergeson's northbound lane at the point of impact and that the trailer overlapped into the Bergeson vehicle approximately 12 inches, clearly concluding that fault for the collision and the resulting death of Bergeson rested with Dilworth. That conclusion

also indicates that Bergeson, contrary to Dilworths' claim that the Bergeson vehicle crossed the centerline into the southbound lane, may have taken evasive action and pulled to her right (east), otherwise her vehicle would not have been at least seven (7) feet east of the centerline of the north-south highway at the point of impact.

The duration and intensity of the relationship between Thompson and the insurance company is a third factor that should be considered under the *Ager* rationale. Thompson's work on this case extended, intermittently, over a period of six months, time to make a complete, detailed and thorough comprehensive investigation sufficient to reconstruct the collision. The "intensity" factor, although somewhat more difficult to assess and evaluate, becomes more understandable when one considers that neither the insurance company nor Warta retained, apparently, or consulted with, any other expert, reconstruction or otherwise. The whole task of investigation and reconstruction was placed in Thompson's hands. Added to that is the fact that the insurance company apparently was not dissatisfied with the conclusion reached in Thompson's first report (which was contrary to the Dilworths' interest) because the insurance company requested him to go further and examine the trailer hitch and other mechanical parts of the vehicles involved. It appears that the insurance company was depending heavily (apparently solely), during that period of time, on Thompson's investigation and conclusions.

As to the fourth factor (the terms of the consultation and payment), the court was furnished, prior to and in preparation for the hearing held on January 5, 1990, copies of Dr. Thompson's two reports and copies of his statement of charges for both, addressed to Darrell Warta. The first statement is dated January 8, 1987 and reflects services rendered on September 18, October 27, November 29 and December 13, 1986, and January 8, 1987, totaling 16 hours, and a charge of $2,048.75. The second statement is dated March 16, 1987, and reflects services rendered on February 27 and March 16, 1987 totaling 3 hours and charges of $376.80.

Thompson apparently was initially contacted in this case by telephone on September 11, 1986 by Pete Miller, Claims Superintendent for State Farm Insurance Company. That conversation was confirmed in writing by letter from Miller to Thompson dated September 12, 1986, the pertinent portion of which reads as follows:

> We would like you to inspect the vehicles as well as the scene of the accident and determine exactly the location of each vehicle on the highway at the point of accident on both impacts. We would also like to know the speed of the vehicles, if possible, as well as whether or not any of the drivers took evasive action. The Bergeson car and the trailer which was being pulled by Mr. Dilworth are both located in Cedar Point, Kansas. The trailer was hauling a backhoe at the time of the accident and it is located in Marion.[1]

The letter closes with this statement:

> If you need any additional information on this for your investigation please let me know.

Thus, the terms of the consultation and payment indicate a formal retention for a broad and complete investigation of all circumstances pertaining to the collision.

As the *Ager* court indicated, "additional factors bearing on this determination may be examined if relevant."

█ It is difficult to imagine a more relevant and proximate additional factor than the fact that State Farm was the insurer for both Dilworth and Bergeson. With regard to the duties an insurance carrier owes to its named insured, it is sufficient, the court believes, to state that whatever duties the carrier owed to named insured Dilworth, it likewise owed to named insured Bergeson, no more, no less. The court notes, however, that Kansas law appears to characterize the relationship be-

---

1. The phrase "at the point of accident on both impacts." apparently refers to the fact that some few minutes after the Bergeson and Dilworth vehicles had collided and come to rest, a Ford sedan, operated by one Lockridge, collided with one of the stationary Dilworth vehicles.

tween the insured and the carrier as a fiduciary one. The Kansas Supreme Court so stated in the case of *Bennett v. Conrady*, 180 Kan. 485, 490, 305 P.2d 823 (1957). That language and principle was quoted with approval in the later case of *Bullinger v. Nuss*, 202 Kan. 326, 332, 449 P.2d 502 (1969). Consequently, the results of the investigation by Thompson, if furnished to Dilworths (or their lawyers), should likewise have been promptly furnished to Bergeson's survivors (or their lawyer) voluntarily without the necessity of an informal or formal written request. All other documents and records, unless protected by the attorney-client privilege, attorney work product doctrine, or some other bar to disclosure, should likewise, pursuant to the same duty, have been voluntarily and timely supplied to Bergeson's survivors, or their lawyer.

Although it is not controlling authority in this jurisdiction, the Illinois Supreme Court, in the case of *Monier v. Chamberlain*, 35 Ill.2d 351, 221 N.E.2d 410 (1966), reported in full in 18 ALR 2d 471 (and the subject of an annotation at page 482 thereof) dealt with the discovery aspects of a situation where the same insurance company insured both plaintiff and defendant. The court there reached basically the same conclusion, i.e. that most of the records, statements, memoranda and communications, etc., generated by the collision resulting in personal injuries to plaintiff *Monier*, were discoverable by plaintiff during the pretrial discovery process.

Frequently, if not usually, an expert within category 2 is consulted, not for the purpose of considering the operative facts with a view to testifying as to his opinions and conclusions based thereon, but rather to educate counsel about all or some facet of the case as to who and what kind of expert(s) should be consulted and retained to become *trial* expert witnesses or perhaps how to best present to the trier of fact technical and/or complicated evidence with which a court or jury might be unfamiliar and uneducated, or to discover, compile or assimilate information or data upon which a testifying expert will rely in whole or in part. See *Eliasen v. Hamilton*, 111

F.R.D. 396 (N.D.Ill.1986); *Pearl Brewing Co. v. Jos. Schlitz Brewing Co.*, 415 F.Supp. 1122 (D.C.S.D.Tex., 1976); *Heitmann v. Concrete Pipe Machinery*, 98 F.R.D. 740 (D.C.E.D.Mo.1983) and *Delcastor, Inc. v. Vail Associates, Inc.*, 108 F.R.D. 405 (D.C.Colo., 1985). If the expert fits either description, Rule 26 and the *Ager* decision appear to protect such expert's conclusion(s) and opinion(s) from disclosure, either in writing or by deposition. In each of the above cited cases, the court concluded that counsel had correctly designated a category 2 expert and protected from disclosure all of that expert's findings and conclusions, except those findings and conclusions considered by the *testifying* expert in reaching *his* findings, conclusions and opinions.

There may be other experts with different profiles that fall within category 2, however the court is not aware of any and counsel, in their briefs, suggest none.

Measured against either of the above profiles, Thompson does not fit in category 2. Neither the terms of his retention, the investigation he made nor the contents of his written reports give any indication whatever that his purpose was to educate the insurance company or defense counsel as to what kind of experts, consultative or testimonial, they should seek to find, or to assist in the presentation, at trial, of complicated or highly technical evidence, or to educate a *trial* expert as to all or some portion of the basis for his testimony.

The court concludes defense counsel's interpretation of the *Ager* decision is misplaced, that rather, Thompson was a category one expert, and the *Ager* decision provides no basis for failing to promptly and fully answer plaintiff's interrogatory, identify Dr. Thompson and timely produce his reports in response to plaintiff's initial Interrogatories and Requests for Production.

■ Even if State Farm had not insured Bergeson, and even if it be conceded that Thompson was indeed a category 2 expert, exceptional circumstances "justifying disclosure of the expert's identity, opinions

[and] other collateral information" appear to be present. Thompson's investigations began on September 18, 1986, fourteen (14) days after the collision on September 4 and continued, intermittently, until January 8, 1987. It began again on February 27, and ended on March 16, 1987. This case was not filed until September 30, 1987, over a year after the collision. It is safe to assume (indeed, the pleadings pertaining to discovery in this case verify the validity of the assumption) that plaintiff's counsel, as usually occurs in automobile collision cases, was on the "slow" side and was unable, probably unaware, of the collision until long after the evidence at the scene and probably the vehicles involved were no longer available to be inspected by him or other agents of the plaintiff. It is not within the knowledge of the court when plaintiff's counsel first became aware of the collision but it is likely that by the time he learned of the incident (probably from his clients, the Bergesons) it ·was impossible for him (or *plaintiff's* investigators or other agents) to gain much information, if any, from an examination of the scene or the vehicles involved. Such necessitus circumstances go a long way toward meeting the "undue hardship" criteria, as defined in Rule 26(b)(3), and are usually considered sufficient grounds to justify the court in ordering disclosure of facts which might otherwise be protected.

A portion of the notes of the Advisory Committee on Rules, to Rule 26 states:

> Sub–Division (b)(4)(B) is concerned only with experts retained or specially consulted in relation to trial preparation. Thus the sub-division precludes discovery against experts who were informally consulted in preparation for trial but not retained or specially employed. As an ancillary procedure, a party may *on a proper showing* require the other party to name experts retained or specially employed but not those informally consulted [emphasis supplied].

The above language is quoted on page 503 of the *Ager* opinion, following which, the court states:

We hold that the 'proper showing' required to compel discovery of a non-witness expert retained or specially employed in anticipation of litigation corresponds to a showing of 'exceptional circumstances under which it is impracticable for the parties seeking discovery to obtain facts or opinions on the same subject by other means.'

The court concludes and holds that even if Thompson was a "category 2" expert, "exceptional circumstances exist[ed] justifying disclosure of the expert's identity, opinions [and] other collateral information." *Ager, supra* page 504.

> *Does defense counsel's conduct in filing the Answer denying liability of the Dilworths, alleging Bergeson's conduct was the cause of the collision, and in failing to timely answer plaintiff's interrogatory number 2 and request for production number 3 fall within the ambit of Rule 11?*

In response to plaintiff's assertion that Rule 11 was violated by the signing of the Answer and the responses to the Interrogatories and Request for Production, defendants argue that neither Rule 11 nor Rule 26 was violated; that an attorney's conduct under Rule 11 is evaluated under a standard of "objective reasonableness" at the time of filing (citing *Adamson v. Bowen*, 855 F.2d 668, 673 (10th Cir.1988) and *Murphy v. Klein Tools, Inc.*, 123 F.R.D. 643 (D.Kan.1988); that Rule 11 is violated where it is patently clear that a claim has absolutely no chance of success under the existing precedents and where no reasonable argument can be advanced to extend, modify or reverse the law as it stands, (citing *Murphy, supra* at 646 and *Eastway Construction Corporation v. City of New York*, 762 F.2d 243, 254 (2nd Cir.1985); that violation of Rule 11 requires a pleading be brought which was not warranted by existing law, interposed for an improper purpose or interposed to cause unnecessary delay; that plaintiff has failed to show that no reasonable attorney would have interpreted the precedents set forth by the 10th Circuit in the *Ager* case and the language of Rule 26 to allow them to withhold such documents from discovery, absent a show-

ing of undue hardship, and that there has been no showing by plaintiff that defendants' position was taken for an improper purpose, or that it was taken to cause an unnecessary delay or hardship to the plaintiff.

Rule 11 of the Federal Rules of Civil Procedure states, in pertinent part:

"Every pleading, motion, *and other paper of a party* represented by an attorney shall be signed by at least one attorney in the attorney's individual name, whose address shall be stated.... The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion *or other paper;* that to the best of the signer's knowledge, information, and belief *formed after reasonable inquiry it is well grounded in fact* and is warranted by existing law or good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation ..." (Emphasis supplied)

Generally, and loosely speaking, members of the legal profession use the word "pleadings" to define any and all papers filed in the court file. Technically speaking, however, "pleadings" are defined by Rule 7(a), FRCvP. "Motions and other papers" are delineated from "pleadings" in part (b) of Rule 7. It appears clear that the drafters of Rule 11 were aware of and consistently followed the delineating language in Rule 7 by using the phrase "every pleading, motion, and other paper" of a party, in Rule 11.

■ Clearly the Answer to the Complaint filed by defense counsel falls within the definition of "pleadings" in Rule 7(a) and Rule 11.

■ That *"motions and other papers"*, as well as "pleadings", are within the ambit of Rule 11 is indicated by the express language thereof. The phrase "pleading, motion, and [or] other paper" is used five times in Rule 11, too often to be disregarded as meaningless or inadvertently includ-

ed. In addition, the scope of Rule 11 is indicated by the notes of the Advisory Committee on Rules pertaining thereto which states:

Although the encompassing reference to 'other papers' in new Rule 11 literally includes discovery papers, the certification requirement in that context is governed by proposed new Rule 26(g). Discovery motions, however, fall within the ambit of Rule 11.

In addition, Rule 7(b)(3) provides that "All motions shall be signed in accordance with Rule 11." Further, the Advisory Committee notes to Rule 7, pertaining to the 1983 amendment thereto, states:

One of the reasons sanctions against improper motion practice have been employed infrequently is the lack of clarity of Rule 7. That rule has stated only generally that the pleading requirement relating to captions, signing, and other matters of form also apply to motions and other papers. The addition of Rule 7(b)(3) makes explicit the applicability of the signing requirement and the sanctions of Rule 11, which have been amplified.

Responses, objections and Answers to Interrogatories and Requests for Production and Admissions expressly fall squarely within Rule 26(g). Rule 26(g) states, in pertinent part:

"**Signing of Discovery Requests, Responses and Objections.** Every request for discovery or *response or objection* thereto made by a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name, whose address shall be stated.... The signature of the attorney or party *constitutes a certification that the signer has read the request, response, or objection, and that to the best of the signer's knowledge, information and belief formed after a reasonable inquiry it is* (a) consistent with these rules and warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; (2) not interposed for any

improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; and (3) unreasonable or unduly burdensome or expensive, given the needs of the case, the discovery already had in the case, the amount in controversy, and the importance of the issues at stake in the litigation." (Emphasis supplied)

The Advisory Committee Note pertaining to this subdivision (g) states that "[t]he term 'response' includes answers to interrogatories and to requests to admit as well as responses to production requests."

What is included within the term "other papers"? Except for the language of Rule 26(g), the Rules offer little assistance in defining "other papers". Much of the language in Rule 26(g) is substantially identical to that in Rule 11 and the signature of the lawyer to discovery requests, responses and objections has substantially the same effect and penalty as the signing of "pleadings and motions" in Rule 11. Obviously, the drafters meant the phrase "other papers" to include something in addition to pleadings and motions.

The court finds, therefore, that "other papers" include discovery motions, interrogatories and requests for production and admissions and the responses thereto, such as are now before the court in this case. The court further finds that "other papers" fall within the scope of Rule 11 and that the issues raised by plaintiff's Interrogatories, Requests for Production (and defendants' Responses thereto) can properly be resolved under Rule 11.

*Reasonable inquiry—well grounded in fact requirement of Rule 11*

Rule 11 contains language as to the scope of the "reasonable inquiry" the lawyer must make to include the signer's "knowledge, information and belief" that the content of the pleading, motion or other paper *"is well grounded in fact"*. The phrase is not included in Rule 26(g). Defense counsel, apparently, overlooks those words in Rule 11. Defendants' Response (# 52) to the instant motion, contains no reference to that phrase nor does it assert

any argument based thereon. That language is, the court believes, of decisive significance in connection with the content of the *Answer* counsel filed on behalf of defendants and the Responses to plaintiff's Interrogatories and Requests for Production.

With regard to the *Answer* filed by counsel on behalf of the Dilworths, the law appears to be clear that in those situations where the lawyer is being paid by the liability insurance carrier to represent the named insured, the lawyer's first duty is to the named insured as the "client", not the insurance carrier, and the lawyer's obligation is to protect that client's interests and seek to advance that client's objectives within the scope, nature and extent of the coverage provided by the insurance policy. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 536 F.2d 730, 737 (7th Cir., 1976) and cases there cited. There are, of course, well known ethical rules which govern the lengths (and breadths) to which a lawyer can go in performing his duty to his client.

■ Even though his first duty is to his client, a fundamental duty of the lawyer is to ascertain the true facts, and advise the client as to the applicable law, usually in that order—for until the facts, or at least what the lawyer then, in good faith, concludes the facts to be, are ascertained, it is impossible to accurately advise the client as to the law.

■ What, then, are the criteria by which the lawyer should determine the true facts? Can he rely solely upon what his client tells him or must he go further and conduct his own investigation to the extent necessary to satisfy himself that he has the true facts? To pose the question is to suggest the obvious answer. No rational, competent lawyer can rely solely upon his client's version of the facts when it is, or becomes obvious during the course of the representation, from other reliable sources, or the plain physical or mechanical circumstances, that the client's version is inaccurate, mistaken or related in bad faith. A reasonable inquiry into the facts ordinarily

288

requires more than exclusive reliance on representations of fact made by a client. *Southern Leasing Partners, Ltd. v. McMullan*, 801 F.2d 783, 788 (5th Cir.1986).

■ How the lawyer resolves a conflict between the operative facts his investigation discloses to him, on the one hand, and the facts as related to him by the client, on the other, can be a difficult and perplexing problem which may, on occasion, result in the termination in the lawyer-client relationship. But when it becomes obvious that the facts are not as stated by the client the lawyer's duty is clear. If he cannot convince his client of what he knows the true facts to be, he must ultimately withdraw. To blindly proceed and advise the client on the basis of facts that are obviously inaccurate and incorrect is to invite disaster, both for the client's cause and the lawyer's professional integrity.

■ In the instant case, defense counsel had knowledge of the physical facts of the collision through the diagram of the investigating Kansas Highway Patrol officer(s), the investigation and written analysis, including a diagram of the accident scene, of an experienced and well respected accident reconstruction expert who, at the request of the insurer, visited the accident scene, observed the physical elements, took measurements and photographs, examined the vehicles involved, photographed them and prepared a detailed written report of his findings, conclusions and opinions as to how the collision occurred, the approximate speed of the vehicles, their position prior to, at the time of, and immediately after the collision and the precise point of impact. The facts as related by the insureds to their counsel are totally inconsistent with the physical facts observed, found and determined by the reconstruction expert who concluded the point of impact was 8 feet east of the centerline of the roadway in which the decedent was traveling north and the defendant south. The position of the insureds (Dilworths), on the other hand, is that the decedent was at fault and operated her vehicle over the center line and to the west of it into the southbound lane in which the defendants were traveling.

There may be some evidence to substantiate that position, however absolutely no evidence has been made known to the court in the briefs or arguments of counsel to support the Dilworths' version. All the physical facts support the conclusion of the accident reconstruction expert.

Rule 11 requires a "reasonable inquiry" into the facts (and the law). Defense counsel had access, early on, to the results of the "inquiry" made by the insurance company, yet chose to disregard the results thus made known to him and based the *Answer* solely upon the unsubstantiated and uncorroborated statements and deposition testimony of the Dilworths.

"... An attorney should rely on a client's statements only when reasonable to do so; if possible, the attorney should attempt to corroborate such statements by interviewing available witnesses and reviewing accessible documents." *Autotech Corporation v. NSD Corporation, et al.*, 125 F.R.D. 464, page 470 (D.C.N. D.Ill.1989) and *Nassau–Suffolk Ice–Cream v. Integrated Resources*, 114 F.R.D. 684, 689 (S.D.N.Y.1987).

Compared to the bald, unsupported claims of the Dilworths, the evidence supplied to counsel by the Thompson reports was overwhelming, particularly in view of the fact that nothing in Thompson's reports lent any credibility whatever to the Dilworths' version. Neither did any other information from any other source tend to substantiate the Dilworths' version of how the collision occurred. The court is reminded of the remark attributed to Mark Twain to the effect that "A man who can read and doesn't is no better off than one who cannot read." Likewise, a lawyer who has the facts and chooses to disregard them, is no better off than a lawyer who doesn't have the facts. Why make any inquiry at all if the facts disclosed by the inquiry are to be ignored?

In upholding the appropriateness of sanctions (in a case arising in this district), the Tenth Circuit Court of Appeals (Logan, J.) stated "We agree that sanctions are appropriate in this case, not because plaintiffs failed to inquire into the facts of their

claims, but because they failed to act reasonably given the results of their inquiries." *White, et al. v. General Motors Corporation, Inc.,* 908 F.2d 675, 682 (10th Cir.1990).

Can counsel be justified in adopting Dilworths' version and persisting in that position after time for examination and reflection?

With regard to defendants' Answer, the pivotal acts were the signing and filing of the pleading containing allegations that were directly contrary to what the inquiry disclosed, in violation of the duty to make certain that the allegations were well grounded in fact.

▉ With regard to plaintiff's Interrogatory and Request for Production, the pivotal acts were the signing and submission of the Responses which failed to include the true facts then in defense counsel's possession and knowledge, and persisting in that position in violation of his continuing duty.

The pivotal acts of the former may not be precisely the same as the pivotal acts of the latter, but the nature and kind of both are, it appears to the court, directly contrary to the letter and intent of Rule 11.

### State of Mind and Objective Reasonableness

During oral argument on January 5, 1990, defense counsel stated:

I want to address that last point, if you don't mind. It's the conjunction in there, the word 'and', Your Honor

THE COURT: The part [of Rule 11] I read?

WARTA: If you go through it—the signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion or other paper, that to the best of the signer's knowledge, information and belief, formed after reasonable inquiry, it is well grounded in fact and is warranted by law or a good faith argument for the extension, modification or reversal of existing law (and here is the important part) *and* that it is not interposed for any

improper purpose such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

In other words, it's not an *or* situation, it's an *and,* so that in addition to finding the first part you also have to find, in effect, that it was signed or interposed for an improper purpose such as to harass or cause unnecessary delay or needlessly to increase the cost of litigation. Now that requires more—that *and* the language after that is certainly something more than negligent conduct. That would have to be that you are doing it, the reason you've done it is for an improper purpose—such as to harass, cause unnecessary delay or needlessly increase the cost of litigation. If you do that, those are volitional acts and not something that comes across from mere negligence.

The point I'm trying to make, at the time I answered these Interrogatories and this Request for Production of Documents, I took the expert reports that Dr. Thompson had done to be expert reports for me prepared in anticipation of litigation and if I deemed him not to be a witness in this case as an expert, that I didn't have to identify him.

When I found out later on and realized it was State Farm who had hired him, afterwards, then I corrected that. So, what I'm saying, when I made the 'mistake', that I made, I was not making that mistake for any improper purpose. I did, in good faith, what I thought I could do then under Rule 26 and how Rule 26 treated experts that were retained in anticipation of litigation.

THE COURT: Will the same argument apply to your Answer to the Complaint, too?

WARTA: Same thing, Your Honor.

Thus, defense counsel contends that the language of Rule 11 requires something more than simple inadvertence or negligence to constitute a violation. He also argued, in his brief, that an attorney's conduct under Rule 11 is evaluated under a standard of "objective reasonableness" at

the time the pleading, motion or other paper is filed, or submitted.

▇▇ With regard to the phrase that the content of the pleading, motion or other paper be "well grounded in fact *and* warranted by existing law or a good faith argument", etc., the conjunctive word "and" means that if the pleading, etc., is either not well grounded in fact or is not warranted by existing law, etc., either or both, the Rule is violated. The facts before the court raised by the instant motion do not involve a claim by plaintiff that defendant's position was not "warranted by existing law or a good faith argument", etc. Rather, the issue here is whether defendants' pleadings were "well grounded in fact."

In addition to the *Ager* case, already discussed, defendants cite only *Adamson v. Bowen*, 855 F.2d 668 (10th Cir.1988) as authority for application of the "objective reasonableness" standard; *Murphy v. Klein Tools, Inc.*, 123 F.R.D. 643 (D.Kan. 1988) as authority that reasonableness is assessed as of the time of filing, and *Eastway Corporation v. City of New York*, 762 F.2d 243 (2nd Cir.1985), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987) as authority for Rule 11 being breached because the pleading is not "warranted by existing law", etc. The court agrees that counsel is correct in relying upon the *Adamson* case for the objective reasonableness standard, i.e. whether a reasonable attorney, admitted to practice before the district court, would, under the circumstances, file such a document. *Adamson*, page 673. In that case the Circuit Court also relied upon the *Eastway* case and quoted the rule from *Eastway* as "If 'after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well-grounded in fact and is warranted by existing law' ... then such conduct is sanctionable under Rule 11." (p. 673)

While the *Adamson* case *is* authority for the rule cited by defendants, the *ratio decidendi* of that portion of the case dealing with sanctions is contrary to defendants' position. In that case, the trial court imposed sanctions (attorneys fees) against the Secretary of the United States Department of Health and Human Services based on the Secretary's *Answer* to Adamson's allegations and then pursuing an appeal from the administrative decision without, as the District Judge stated, "a scintilla of evidence to support her position." The *Adamson* court stated:

The standard by which courts evaluate the conduct of litigation is objective reasonableness—whether a reasonable attorney admitted to practice before the district court would file such a document. (citations omitted.) If 'after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law ...,' (citing the *Eastway Construction Corp.* case), then such conduct is sanctionable under Rule 11. The attorney must 'stop, look, and listen' before signing a document subject to Rule 11. (citations omitted)

For the Secretary's answer to be objectively reasonable within the contemplation of Rule 11, the facts must have been sufficient to allow the Secretary to defend the agency ruling in objective good faith as being supported by 'substantial evidence.' (citation omitted)

... The administrative record, all of which was available to the Secretary at the time the answer was filed with the district court, presents overwhelming evidence of Adamson's disability. We might take issue with the district court's factual conclusion that the Secretary's defense of this action lacked even a 'scintilla of evidence' to support it. However, the little evidence that supports the Secretary's position is indeed tenuous, particularly when balanced against the overwhelming evidence supporting Adamson's claim.

.    .    .    .    .

When evidence supporting the Secretary is so slight and the contrary evidence so overwhelming, a reasonable attorney for the Secretary could not have concluded that the minimal supporting evidence constituted the 'substantial evidence'

needed to affirm the administrative decision under 42 U.S.C. § 405(g). Thus, the Secretary objectively could not have believed the position taken here to be 'well-grounded in fact,' as Rule 11 requires. (Pages 673–74)

The court also agrees the Rule that "reasonableness is assessed under the circumstances as of the time of filing" [or submission] is expressed in the *Klein Tools* case. That appears to be the majority rule although there is respectable authority to the contrary, i.e. that the attorney's duty to make sure the allegations of his pleadings are well grounded in fact is a *continuing one.* In *Meadow Ltd. Partnership v. Heritage Savings & Loan Association, et al.,* 118 F.R.D. 432 (D.C.E.D.Va., 1987), aff'd 850 F.2d 207 (4th Cir., 1988), the court makes a persuasive argument for a continuing duty. (118 F.R.D. at 434). *See also Pantry Queen Foods, Inc. v. Lifschultz Freight, Inc.,* 809 F.2d 451, 454 (7th Cir.1978). The Tenth Circuit does not appear to have addressed that issue. The language of Rule 11 does not exclude a "continuing duty" to meet its requirements. Though the court believes a "continuing duty" is the more logical, reasonable standard, if the rule stated in *Klein Tools* is the majority rule (as it appears to be), it is of little benefit, if any, to defense counsel in the instant situation. The facts clearly show that he had possession of both of Thompson's written reports by March, 1987. Suit was not filed until September 30, 1987 and defendants' *Answer* was not filed until November 20, 1987. Counsel not only had knowledge of the operative facts, he had more than enough time to reconsider and deliberately reflect on the conflict between the Dilworths' version, on the one hand, and the findings and conclusions of Thompson, on the other, long before he drafted and filed the Answer or the Responses to plaintiff's Interrogatories and Requests for Production. Once he interviewed or consulted with the Dilworths, the striking difference in their version of the collision and Thompson's was, or should have been, painfully obvious. Given the natural inclination of most people to rationalize facts to serve their interests, the suggestion that the Dilworths might be rationalizing or were mistaken, or were deliberately lying to protect their interests, must, in view of Dr. Thompson's objectively detached report and findings, have occurred to counsel. That conclusion might be different if defense counsel was just out of law school, inexperienced and perhaps naive about human nature. Given his experience in handling the defense in auto collision cases over the past 18 to 19 years, the court finds it unbelievable that the conflicting views thus presented to him did not cause him to seriously question the Dilworths' version *before* he filed the Answer on their behalf.

In their Response to plaintiff's Motion for Sanctions, defendants state:

> Rule 11 is violated 'where it is patently clear that a claim has absolutely no chance of success under the existing precedence, and where no reasonable argument can be advanced to extend, modify, or reverse the law as it stands.' *Murphy* at 646, quoting from *Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 254 (2d Cir.1985) cert. denied [484] U.S. [918], 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).

The holding in the *Eastway* case (which is also reported at 637 F.Supp. 558 (E.D.N.Y.1986) and 821 F.2d 121 (2d Cir.1987)) that Rule 11 was violated was based on the failure to allege a valid anti-trust claim (see pages 251 and 254) not on a failure to ascertain that the allegations were "well grounded in fact." That portion of the case thus appears inapplicable to the instant issue.

█ Defense counsel's argument that the words in Rule 11 "... *and* that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation," mean that if the lawyer's acts or omissions were merely careless or negligent, at the time of filing, then the rule is not breached and sanctions cannot be proper, does not appear to be consistent with the conclusion reached by the authorities and cases.

With regard to the required state of mind of the lawyer at the time of filing, *Eastway Construction Corp. v. City of New York,* supra, appears to be a leading case. In affirming the decision of the trial court imposing sanctions, the *Eastway* court explained:

> The language of the rule, which was amended in 1983, provides a striking contrast to the words of its predecessor. Prior to the 1983 amendment, the rule spoke in plainly subjective terms: An attorney's certification of a pleading was an assertion that 'to the best of his knowledge, information, and belief, there [was] good ground to support it.' The rule, therefore, contemplated sanctions only where there was a showing of bad faith, *Nemeroff [v. Abelson] supra,* 620 F.2d [339] at 348 [ (2d Cir.1980) ], and the only proper inquiry was the subjective belief of the attorney at the time the pleading was signed.
>
> The addition of the words 'formed after a reasonable inquiry' demand that we revise our inquiry. *See Schwarzer, Sanctions Under the New Federal Rule 11—A Closer Look,* 104 F.R.D. 181 (1985). No longer is it enough for an attorney to claim that he acted in good faith, or that he personally was unaware of the groundless nature of an argument or claim. For the language of the new Rule 11 explicitly and unambiguously imposes an affirmative duty on each attorney to conduct a reasonable inquiry into the viability of a pleading before it is signed. Simply put, subjective good faith no longer provides the safe harbor it once did.

. . . . .

Thus the drafters speak of the amended rule as an attempt to 'build upon and expand' the equitable doctrine. To this end, they state, the new language is 'intended to reduce the reluctance of courts to impose sanctions ... *by emphasizing the responsibilities of the attorney'* (emphasis added). Finally, the drafters make absolutely clear that the standard is more stringent than the original good faith formula set forth in *Nemeroff, supra.*

In light of the express intent of the drafters of the new Rule 11, and the clear policy concerns underlying its amendment, we hold that a showing of *subjective bad faith is no longer required to trigger the sanctions imposed by the rule.* Rather, sanctions shall be imposed against an attorney and/or his client when it appears that a pleading has been *interposed for any improper purpose, or where,* after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact ...

The language from Judge Schwarzer's article, mentioned above in the *Eastway* case, and reported at 104 F.R.D. 181 (1985), is, the court believes, worth quoting in pertinent part.

> The certification which results from the attorney's signature of the paper is directed at the three substantive prongs of the rule: its factual basis, its legal basis, and its legitimate purpose. In this and the following two sections, this article discusses each prong separately. It must be recognized, however, that there is considerable overlap among them.
>
> With respect to the first prong, the signature certifies that the lawyer 'has read the [paper] * * * that to the best of his knowledge, information and believe formed after a reasonable inquiry it is well grounded in fact * * *' Why does the rule require the attorney to certify that he has read the paper? The purpose plainly is not to penalize a lawyer for failing to read it but to eliminate ignorance as an excuse. There is no room for a pure heart, empty head defense under Rule 11.

. . . . .

These comments raise the question whether signing counsel may satisfy his obligation under the rule by showing that his client or another lawyer gave him the information or approved the paper. It is not unusual for prefiling inquiry to be made by someone other than the signing attorney due to economic ne-

cessity, time pressures or the need for expertise. To what extent will such an inquiry satisfy the signing attorney's obligation?

The rule by its terms does not require signing counsel to have personally performed the inquiry. What it does require is that signing counsel have the requisite 'knowledge, information, and belief.' Conclusory statements from a client or another attorney that, for example, a car had been driven negligently, sales occurred in violation of a trademark, or certain persons conspired to deny plaintiff's constitutional rights, do not without more afford the lawyer a basis for certifying knowledge information and belief. Regardless of how firmly the attorney may believe such statements from his client, he needs facts on which to ground knowledge, information or belief.

What is crucial under the rule is not who makes the inquiry, but whether as a result the *attorney* has acquired knowledge of facts sufficient to enable him to certify that the paper is well-grounded in fact. If the rule is to have meaning, those facts must consist of admissible evidence or at least be calculated to lead to such evidence. They need not be undisputed or indisputable but they must be sufficiently substantial to support a reasonable belief in the existence of a factual basis for the paper. Suspicion, rumor or surmise will not do.

The duty of inquiry therefore should be regarded as nondelegable but capable of being satisfied by the attorney's acquisition of the product of inquiry conducted by others. Thus if the client furnishes facts to the attorney which he can reasonably believe, there should be no need for further inquiry to satisfy the rule. But if all the attorney has is his client's assurance that facts exist, he has not satisfied his obligation.

In addition to the cases cited by Judge Schwarzer in support of the conclusion that Rule 11 eliminates ignorance and negligence as an excuse or defense to violating the "well-grounded in fact" requirement of the Rule, there are numerous cases from various jurisdictions applying the same principle.

In *Continental Airlines v. Group Systems International Far East Ltd., et al.,* 109 F.R.D. 594, 596 (D.C.C.D.Calif., 1986) wherein the court stated that " 'The standard is one of reasonableness under the circumstances'. That standard of reasonableness is an objective one and subjective bad faith does not enter into it."

In *Woodfork By and Through Houston v. Gavin,* 105 F.R.D. 100, 104 (D.C.N.D. Miss., 1985) it was held that the standard for imposing sanctions prior to the August, 1983 amendment to Rule 11 was whether the action was commenced in good faith, however the new standard is much stricter and permits the imposition of sanctions for failure by the attorney to make reasonable prefiling inquiry into the facts and the law of the case.

In *Nassau–Suffolk Ice Cream, Inc. v. Integrated Resources,* 114 F.R.D. 684, 689 (D.C.S.D.N.Y., 1987) the court concluded that the test was an objective one, no longer requiring a finding of the attorney's bad faith, as was necessary before the 1983 amendment to Rule 11, and that sanctions were to be imposed when a competent attorney could not form the requisite reasonable belief as to the validity of what he asserted in the paper.

In *Mohammed v. Union Carbide Corp.,* 606 F.Supp. 252, 260–62 (D.C.E.D.Mich., 1985) the court, in imposing sanctions against plaintiff's attorney, concluded that the failure of counsel to conduct a reasonable inquiry into the merits of a defamation claim was a violation of Rule 11, and rejected the "good faith" argument of counsel.

In *Colorado Chiropractic Counsel, et al. v. Porter Memorial Hospital, et al.,* 650 F.Supp. 231, 237 (D.Colo., 1986) the court held that a showing of subjective bad faith was no longer necessary to the imposition of sanctions and that the standard is now one of "reasonableness under the circumstances". In an opinion by Judge Finesilver, numerous cases, including other Colorado cases and other cases arising in the

Tenth Circuit, are cited where sanctions have been imposed under Rule 11.

In *Westmoreland v. CBS, Inc.*, 770 F.2d 1168, 1177, 1180 (D.C.Cir.1985) the court explained the intent and effect of present Rule 11 as follows: "Unlike the pre–1983 Rule 11, which required a showing of subjective bad faith, Rule 11 now incorporates, through its language, 'formed after reasonable inquiry,' an objective test". The court further stated that the "standard is one of reasonableness under the circumstances".

On page 1180, the language of the court helps to define the line of demarcation between the requirements of Rule 11 vis-a-vis the need of the court to refrain from exerting a chilling effect upon the ingenuity and creativity of counsel. The court said:

> Mindful of counsel's duty to represent the client's interest with zeal and vigor, we encourage the creative persuasion that fosters growth in the law. However, such creativity has its bounds; proceedings must be 'well-grounded in fact and ... warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law.' and while 'a party or counsel is not to be penalized for maintaining an aggressive litigation posture,' (citation omitted) 'attorneys do not serve the interests of their clients, of the profession, or of society when they assert claims or defenses grounded on nothing but tactical or strategic expediency,' (citation omitted).

In *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 831 (9th Cir., 1986) the circuit court, although reversing the decision of the district court, articulated the principle at issue as follows:

> Thus, we affirm that Rule 11 sanctions shall be assessed if the paper filed in district court and signed by an attorney or an unrepresented party is frivolous, legally unreasonable, *or without factual foundation,* even though the paper was not filed in subjective bad faith. (Underlining added).

In *White, et al. v. General Motors Corporation, Inc., supra,* the Tenth Circuit Court of Appeals, citing *Adamson v. Bowen, supra,* stated that "A good faith belief

in the merit of an argument is not sufficient; the attorney's belief must be in accord with what a reasonable, competent attorney would believe under the circumstances."

In *Alvarado Morales v. Digital Equipment Corp.*, 669 F.Supp. 1173, 11987–88 (D.C.D. Puerto Rico, 1987) sanctions were imposed against plaintiff's counsel for violation of Rule 11. In so ruling, the court stated:

> The 1983 amendments to Rule 11 abandoned the rules' 'subjective test,' which has required that sanctions be imposed only if the signer of the document acted in bad faith: 'If it appears to the court upon hearing that the pleading is *not* well-grounded in fact or law and that there was no reasonable inquiry made before filing, the court is *required* to impose a sanction without regard to whether the failure was willful or inadvertent.'

> That counsel may only have made a mistake, readily acknowledged and rectified his or her error, committed only a 'clerical error,' or at all times acted in good faith, will not release him from sanctions.

> Indeed, sanctions are *mandatory* under Rule 11 where an attorney fails to make reasonable efforts to determine that his or her pleading is well-grounded in fact. (Citations omitted).

The *Morales* case was affirmed on appeal to the First Circuit. *See* 843 F.2d 613 (1988).

The court finds, therefore, that it is no defense to plaintiff's Motion for Sanctions that defense counsel, by signing and filing the Answer to the Complaint and by signing and submitting the Responses to plaintiff's Interrogatories and Request for Production, had no improper purpose or intent to harass, or to cause unnecessary delay or needless increase in the cost of litigation. Likewise, the fact that defense counsel may have misunderstood or misinterpreted Rule 26, the *Ager* case, or Rule 11, is not a defense to plaintiff's motion.

Defense counsel orally argued that:

In terms of any damage or delay, there has been none. There's been no damage to Mr. Post or to his case. Nothing has changed in this case at all since the pre-trial back in 1988 other than they now claim for punitive damages.

Plaintiff's counsel argues just the opposite—that the case has been delayed, that he and his clients have been put to needless time, effort and expense by defense counsel's failure to comply with the requirements of Rule 11.

Counsel must, of course, be allowed an opportunity to be heard, at least through their written briefs, on this issue. See *White, et al. v. General Motors Corporation, Inc., supra,* and *Braley v. Campbell,* 832 F.2d 1504, 1514 (10th Cir.1978).

Certainly, the time and effort necessarily expended by the court in reading the briefs, hearing arguments, and in researching the law and writing this opinion has been extraordinary. The briefs of the parties were of little value to the court and reflected that counsel had spent only minimal time and effort in research and briefing. Plaintiff's counsel cited no law at all except Rule 11. Defense counsel cited four cases, as previously mentioned. None of the briefs contain any more than the barest and skimpiest reasoning and discussion about the issues and principles involved in deciding this motion.

Such motions divert the court from the mainstream of its work in deciding motions concerned with the merits of discovery issues, conducting scheduling conferences, final pretrial conferences, drafting orders, processing criminal cases and the myriad of other duties which seem to increase daily. Further, it is a distasteful task, whether sanctions are imposed or not.

As Judge Schwarzer states in 105 F.R.D., at page 205 (which language the *Westmoreland* court also quoted):

> Of all the duties of the judge, imposing sanctions on lawyers is perhaps the most unpleasant. A desire to avoid doing so is understandable. But if judges turn from Rule 11 and let it fall into disuse, the message to those inclined to abuse or misuse the litigation process will be clear. Misconduct, once tolerated, will breed more misconduct and those who might seek relief against abuse will instead resort to it in self-defense.

On the record before it, the court believes there is no reasonable alternative other than to find that defense counsel has violated Rule 11, both by signing and filing the Answer and by signing and submitting the incomplete and misleading Responses to plaintiff's Interrogatories and Request for Production. The court so finds.

With regard to the type of sanctions, and amount of any monetary sanctions, Judge Logan, in the *White* case, supra, affords specific guidance, related to the purposes of Rule 11 sanctions:

> Rule 11 sanctions are meant to serve several purposes, including (1) deterring future litigation abuse, (2) punishing present litigation abuse, (3) compensating victims of litigation abuse, and (4) streamlining court dockets and facilitating case management. *See American Bar Association, Standards and Guidelines for Practice under Rule 11 of the Federal Rules of Civil Procedure* (1988), *reprinted in,* 5 Wright, A. Miller & M. Kane, *Federal Practice and Procedure,* 212, 235–36 (supp.1989) (hereinafter *ABA Standards* ). Deterrence is, however, the primary goal of the sanctions. *Cooter & Gell v. Hartmarx Corp.,* [—— U.S. ——], 110 S.Ct. 2447, 2454 [110 L.Ed.2d 359] (1990) ('It is now clear that the central purpose of Rule 11 is to deter baseless filings in district court and thus ... streamline the administration and procedure of the federal courts.').

Counsel are directed to other cases, including *Ramos v. Lamm,* 713 F.2d 546 (10th Cir.1983), cited in the *White* opinion, which provide a richly fertile field of information and legal principles relevant to the court's function in determining the type of sanction, the severity of any sanction imposed, the dollar amount of any monetary sanctions which should be imposed, and other alternative sanctions which may be appropriate. In this regard, counsel for plaintiff is directed to submit to the court, on or before September 28, 1990, his brief,

to include a detailed account of the time and expenses to him and his clients he contends resulted from the failure of defense counsel to timely, fully and completely answer Interrogatory number 2, produce the records and documents requested by Request number 3, and that were caused by defendant's Answer to the Complaint.

The account portion of the pleading should be in affidavit form and should contain, by date, the amount of time expended, the nature and type of work performed, the dollar amount per hour claimed, the initials or name of the lawyer or staff personnel performing the work, and out-of-pocket expenses, if any. Counsel is free to suggest other kinds of sanctions, if any, to which he believes himself or his clients are entitled to have the court impose.

On or before October 29, 1990, defense counsel shall file his brief in response. If new matter is contained in defendants' response, plaintiff may file a reply brief on or before November 12, 1990.

IT IS THEREFORE ORDERED that plaintiff's Motion for Sanctions be, and it hereby is, sustained.

IT IS FURTHER ORDERED that counsel submit their briefs and pleadings pertaining to the type, nature and extent of sanctions as above set forth.